Page 82

1                          Colloquy

2          MR. BAKER:  I mean, how is that determined?  Who

3    made that determination that this would be the fee that would

4    be associated with that particular process?

5          MS. NEWMAN:  I think it developed over time.  I

6    mean, I haven't been there since the beginning.  When I

7    started working, the fees were already in place.  So I don't

8    know the -- I cannot say.  It's --

9          MR. BAKER:  It's not the lender?  It's Fidelity?

10         MS. NEWMAN:  That is Fidelity's fee.  That's our

11   fee.  The lender has nothing to do with our fees.

12         MR. BAKER:  Okay.  And you all don't know how that

13   was determined?

14         MS. NEWMAN:  Well, I'm not saying somebody doesn't

15   know.

16         MR. BAKER:  No, no, no.  You.

17         THE COURT:  She's just saying she doesn't know.

18         MR. BAKER:  Yeah, I'm just saying the people in

19   this courtroom.

20         MS. NEWMAN:  And I know generally.

21         MR. CASH:  And, frankly, at this point, Your Honor,

22   how we develop what we charge --

23         MS. NEWMAN:  Right.

24         MR. CASH:  -- I think is given beyond the scope.

25   And that gets into a lot of very proprietary information.

Page 83

1                          Colloquy

2          THE COURT:  Did I say to you that I wasn't so

3    pressed for the dollars.

4          MR. CASH:  No, you did not.

5          THE COURT:  I'm trying to understand --

6          MR. CASH:  I was just letting you know.

7          THE COURT:  -- whether it depends on whether use and

8    cost are related.

9          MS. NEWMAN:  It's not a click charge if you know

10   what those are.  I mean, there are click charges like Westlaw.

11   Every time you click on something --

12         THE COURT:  Okay.  And --

13         MS. NEWMAN:  -- it's another twenty-five cents.

14   It's not like that.

15         THE COURT:  And there's no difference in the various

16   functions -- you don't subscribe to certain functions and not

17   others and get a -- there's not a price differential so that

18   if you want to use the issues open feature --

19         MS. NEWMAN:  No.

20         THE COURT:  -- that's fine but what if you also want

21   to do an intercom, you want to do notes.

22         MS. NEWMAN:  No.

23         THE COURT:  I mean, it doesn't matter, you can

24   intercom till the --

25         MS. NEWMAN:  You can send a thousand day if you feel

Page 84

1                          Colloquy

2    like taking the time.  No.  Once you have your fee, your have

3    full and free use of the system.  You can upload fifty

4    documents, you can upload two.  There's not a document upload

5    charge.  There's not an extra storage charge.  It's one fee.

6          MR. BAKER:  Was there an uptake charge?  Meaning,

7    when the attorney user initially licenses this product from

8    Fidelity, is there a charge for that process?

9          MS. NEWMAN:  No.  There may -- when the company

10   started years and years ago, there may have been.  But it's

11   web-based.  So once they have access it's just there.  You

12   just have to have internet.

13         MR. CONWAY:  Is it in any way tied to the

14   attorneys' --

15         MS. NEWMAN:  No.

16         MR. CONWAY:  -- fees and the clients'?

17         MS. NEWMAN:  No.

18         MR. CONWAY:  It's tied to -- is the payment tied to

19   any fees that's charged?

20         MS. NEWMAN:  No.

21         THE COURT:  The --

22         MR. CONWAY:  So if an attorney doesn't send bills to

23   the client then the fee is still due?

24         MR. CASH:  Yes.

25         MS. NEWMAN:  Yes.  They get a bill every thirty

Page 85

1                           Colloquy

2    days.  If they're not entitled --

3              THE COURT:  The attorneys for being on the system.

4              MS. NEWMAN:  If they're not entitled to bill until

5    the close of the file --

6              THE COURT:  So there the attorney on the system and

7    then every thirty days you determine how many processes they

8    have --

9              MS. NEWMAN:  Yes, the system will generate.

10             THE COURT:  It automatically calculates how many

11   processes it may come to multiple files.

12             MS. NEWMAN:  Yes.  And they get a bill.  And it

13   details their bill.

14             THE COURT:  And they get -- you know, just like you

15   get a Pacer -- it's like the Pacer --

16             MS. NEWMAN:  Exactly.

17             THE COURT:  -- service center sends out a bill every

18   month.

19             MS. NEWMAN:  Yes.  And if the attorney never gets

20   paid --

21             THE COURT:  -- although that's based on usage.

22   You're saying yours isn't.

23             MS. NEWMAN:  Right.

24             THE COURT:  And if they -- some of the -- you've

25   referred to this escalation and contact matrix --

1                           Colloquy

2            MS. NEWMAN:  Right.  Escalation contact matrix,

3   correct.

4            THE COURT:  And you don't have a problem?  Somebody

5   can escalate and there's no record of that -- well, I guess

6   there's a record of everything but --

7            MS. NEWMAN:  Right.

8            THE COURT:  -- there's no economic consequence to

9   doing that?

10           MS. NEWMAN:  Oh, goodness, no.

11           THE COURT:  Okay.

12           MS. NEWMAN:  No, that's provided.

13           THE COURT:  Okay.  Anybody have anything else for

14  our Lenders Servicing -- okay, good.  Very good.  Thank you.

15  This was very instructive.  But I -- okay.  Does anybody want

16  to take a short break before we --

17           MR. CONWAY:  Your Honor, could we have a recess so

18  we can --

19           THE COURT:  Oh, you can look at the documents.

20           MR. CONWAY:  Yes.

21           THE COURT:  Absolutely.

22       (Recess from 4:01 p.m. until 4:25 p.m.)

23           THE CLERK:  All rise.

24           THE COURT:  Okay.

25           MR. CONWAY:  Yes.

Page 87

1                              Colloquy

2              THE CLERK:  Court's reconvened.  You may be seated.

3              MR. CONWAY:  May I instruct Mr. Udren to take a

4    seat?

5              THE COURT:  Yes.  We certainly -- this is the long

6    awaited --

7              MR. CONWAY:  It is.

8              THE COURT:  -- and hopefully not disappointing

9    testimony of Mr. Udren.

10             MR. CONWAY:  Your Honor, before Mr. Udren is to be

11   sworn in --

12             THE COURT:  Oh, wait.  What happened with the

13   document?

14             MR. CONWAY:  They are substantially identical with

15   the exception of the schedule which relate to fees.

16             THE COURT:  Oh.

17             MR. CONWAY:  So I -- we're prepared to proceed.

18             THE COURT:  Good.

19             MR. CONWAY:  Okay?

20             THE COURT:  Thank you.

21             MR. CONWAY:  But before we go further, one of the

22   documents that was asked to be given to us was the agreement

23   between HSBC and Fidelity.  And the schedules were not

24   attached for whatever reason.  One of the schedules, in

25   particular, Schedule A, basically defines the duties of

1                          Colloquy

2  Fidelity.  It's the heart and soul of the agreement but I

3  never got it.  And so I reserve that for another day but I

4  don't want to let this pass without the Court being aware that

5  I really -- in order to understand the complete agreement, I

6  need the heart and soul, the thing that says this is what

7  Fidelity does.

8           THE COURT:  But it's not your agreement?

9           MR. CONWAY:  It's not Mr. Udren's agreement.

10          THE COURT:  It's the --

11          MR. BART:  He has --

12          THE COURT:  Yes.

13          MR. BART:  -- all the copies that I'm aware of now

14  of the Udren Fidelity --

15          THE COURT:  And since -- well, Mr. Eisenberg, I take

16  it will be addressing the problem that you just identified?

17  Okay.  If you need to -- let's not assume it will be a problem

18  but I understand your reservation.  Okay.  May he be now be

19  sworn?

20          THE CLERK:  Please raise your right hand and place

21  your left hand on the Bible.

22               WITNESS, MARK UDREN, SWORN

23          THE CLERK:  Thank you.  Please be seated.  Please

24  state your name and spell it for the record.

25          THE WITNESS:  Mark Udren, U-D-R-E-N.

Page 89

1                    Mark Udren - Direct

2          THE CLERK:  And could you please state your address

3    for the record?

4          THE WITNESS:  My address?

5          THE CLERK:  Yes.

6          THE WITNESS:  Office address --

7          THE CLERK:  Yes.

8          THE WITNESS:  -- is 111 Woodcrest Road, Cherry Hill,

9    New Jersey.

10         THE CLERK:  Okay.  Thank you.

11                    DIRECT EXAMINATION

12   BY MR. BART:

13   Q.  Good afternoon, Mr. Udren.

14         MR. BART:  For the record, I'm Jonathan Bart,

15   Wilentz, Goldman & Spitzer on behalf of the Udren law firm.

16   As we have proceeded in this matter previously, I'm going to

17   get some background from Mr. Udren.  And then leave it to the

18   trustee to ask whatever questions they may have concerning the

19   events at issue here.

20   Q.  I take it, Mr. Udren, that you are an attorney at law,

21   correct?

22   A.  Yes, I am.

23   Q.  All right.  Can you state where you are admitted to

24   practice law?

25   A.  I'm admitted Pennsylvania, New Jersey and Florida.

1                              Mark Udren - Direct

2    Q.   Okay.  Can you briefly give your law school and college

3    background?

4    A.   I graduated Penn State 1964, oh my goodness.  And

5    Villanova Law School, 1967.  I passed the Pennsylvania bar in

6    1967.

7              THE COURT:  So I'm saying but I was in his class at

8    Penn State.  Do I have to refuse -- there were, like, millions

9    of people on campus.  But I disclose it.

10   Q.   And you currently own a law practice, Mr. Udren?

11   A.   Yes, I do.  Udren Law Offices, P.C.

12   Q.   All right.  And your position with that firm?

13   A.   I'm the president of that company.

14   Q.   Are you the sole shareholder?

15   A.   Yes, I am.

16   Q.   All right.  Can you discuss for the Court and provide the

17   Court with an outline of the business conducted by the Udren

18   Law Offices?

19   A.   We specialize in representation of lenders.  We do

20   foreclosures, bankruptcies in that context.  We do REO,

21   ejectments, anything that the lender requires with regard to

22   residential mortgage lending.

23   Q.   Okay.  And the source of your business generally is from

24   what --

25   A.   It's from the really the names that you see in the

1                         Mark Udren - Direct

2    newspapers even today.  It's been the Well Fargos, Saxons,

3    HSBC.  You know, we probably represent fifty different lenders

4    out there, maybe more.

5    **Q.**   Okay.  And do you represent servicers as well?

6    **A.**   Servicers, yes.

7    **Q.**   All right.  Now, do you have dealings with Fidelity

8    National Foreclosure Solutions, Inc.?

9    **A.**   Yes, we do.

10   **Q.**   Okay.  What is -- to your understanding, what is that

11   entity of what we've heard a presentation today?

12   **A.**   Well, not to belabor it.  I mean, the presentation is was

13   what it was.  I mean, we use their services to interact with

14   our clients.  We use the NewTrak system and we found it very

15   beneficial.  We liked it.

16   **Q.**   All right.  And how does the Fidelity assist the conduct

17   of your clients.

18   **A.**   Well, the demonstration we saw today is really -- you

19   know, I go back to -- I miss the click clack of the IBM

20   Selectra Typewriter.  So, I mean, that's the era that I grew

21   up in the law practice.  So a lot of this is really -- I've

22   had to go kicking and screaming into accepting it.  But now

23   that I have accepted it, I don't know how we could practice at

24   the current fee levels without these kinds of aids.  I mean,

25   we rely on this dramatically.  This allows paralegals to

Page 92

1                              Mark Udren - Direct

2    interact with the client through the system, get information,

3    ask for information without having to come to me and play

4    telephone tag for sometimes weeks at a time.

5    **Q.**  So, in your opinion, the Fidelity relationship has

6    assisted you in providing information to Courts and to perform

7    the work that you do on a daily basis?

8              THE COURT:  Try to have him tell me about it, not

9    you, Mr. Bart.  I think it would be more helpful.

10             MR. BART:  Well, I'm just basically summarizing but

11   you're right.  That's --

12             THE COURT:  You don't have to summarize.  I --

13             MR. BART:  All right.  Let me --

14             THE COURT:  -- listen.

15             MR. BART:  Let me mark, if I will -- it's Mark Udren

16   1 because we had prior exhibits marked as Udren.

17             THE CLERK:  Yes, we do.  We're on 13.

18             MR. BART:  All right.  Why don't we go Udren 14?

19             THE WITNESS:  Okay.  I'm sorry.  What was the

20   question now again?

21             THE COURT:  Do I have a --

22             MR. BART:  Your Honor, I have an extra one.

23             THE COURT:  Oh, okay.  Is this old stuff that's

24   being redone or something?

25             THE CLERK:  No, this is --

1                    Mark Udren - Direct

2            THE COURT:  Oh, okay.

3            THE CLERK:  Last time we had Udren 13.  So --

4            THE COURT:  Okay.  So this is Udren 14?  Okay, okay.

5            MR. BART:  I don't have copies with me but --

6            THE COURT:  Do you have a copy, Mr. Conway?

7            MR. CONWAY:  Yes, I do.  I was just pointing

8     something out to counsel.

9            THE COURT:  Okay.  Just because I don't need one

10           MR. BART:  I'll deal with it.

11           MR. CONWAY:  -- if you don't.  You're more

12    important.

13           MR. BART:  All right.

14    BY MR. BART:

15    Q.  I'm showing you a document which has been produced in

16    these proceedings entitled "Network Agreement".  It's Bates

17    stamped starting at Taylor 00316.  First, is that your

18    signature at the end of the agreement, Mr. Udren?

19    A.  I'm looking for it now.

20           THE COURT:  Do you have a better copy than I do?

21           MR. CONWAY:  No, Your Honor.

22           MR. BART:  This is what was produced through the

23    pdf.

24           THE COURT:  Through the what?

25           MR. BART:  The production that we got via e-mail

Page 94

1                            Mark Udren - Direct

2    from Fidelity yesterday.

3            MR. CONWAY:  It's barely legible but if you strain,

4    Your Honor, we manage --

5            THE COURT:  Okay.  Well, you've got younger eyes

6    than I do so if it becomes a problem maybe you'll get me --

7    BY MR. BART:

8    Q.   Did you --

9    A.   Yes.  That is my signature, yes.

10   Q.   Okay.  And this agreement is dated when?

11   A.   This is dated August 31st, 2001.

12   Q.   Okay.  And did you come to sign a subsequent agreement?

13   A.   Yes, I did.

14   Q.   All right.  Do you know the date of the subsequent

15   agreement?

16   A.   I believe the subsequent agreement was dated 2005.  And

17   then there's updated exhibits that I recall that -- 2007.  I

18   quickly -- all this was scanned in our office so I printed

19   what I could.

20           MR. BART:  I'll mark this one but it's my only copy.

21   Q.   This is the 2005 agreement?

22           MR. BART:  I'll have to get you another copy.

23           MR. CONWAY:  No, no.  I don't care.  It's a similar

24   agreement.

25           THE CLERK:  Is it all one --

Page 95

1                          Mark Udren - Direct

2              MR. BART:  Yes.  It's one with exhibits.

3              THE CLERK:  And I just took it off there, right?

4              MR. BART:  Yes, you can.

5    BY MR. BART:

6    Q.    Okay.  Is that the 2005 agreement with 2007 amendments

7    that you referred to?

8    A.    I believe it is, yes.

9    Q.    All right.  Can you locate your signature on that

10   agreement and identify it as well?

11   A.    Yes, that is my signature.

12   Q.    All right.  Let me backtrack for a second.  With respect

13   to the Udren Law Offices, can you state how many attorneys you

14   currently have working for the firm?

15   A.    I believe we have nine or ten.  I mean, we had some leave

16   and some come so I think it's ten.

17   Q.    All right.  Do you how many paralegals are employed by

18   your office?

19   A.    Well, maybe a hundred.

20   Q.    All right.  And approximately how many other

21   administrative personnel that are employed by the Udren Law

22   Office?

23   A:    Probably -- the line between processor and paralegal is

24   really --

25   Q.    Okay.

Page 96

1                     Mark Udren - Direct

2   A.    -- my problem.  So there's 130 total.  And with that,

3   there's processors, there's paralegals and there's

4   administrative personnel.

5   Q.    All right.

6   A.    I mean, I don't have the exact mix.

7   Q.    Can you describe for the Court the process which occurs

8   when the Udren Law Office receives a referral of a matter

9   through the NewTrak system?

10  A.    Yeah.  I'll do the best I can.  Understand that, as time

11  has gone by, I have really delegated a good bit of the

12  administrative process to administrative people.  So that am I

13  an expert on NewTrak?  No, I'm not.  But I do know that the

14  referrals which used to come in little envelopes in the mail

15  now come either on NewTrak or whatever other system the

16  clients may be using.  But it comes into a referral

17  department.  Their sole job is to take these off of NewTrak,

18  open them up, request the documents they need, open a file.

19  We don't even have paper files now.  It's all scanned; it's

20  all electronic.

21  Q.    All right.  And how does a matter get assigned within

22  your office once it comes --

23            THE COURT:  Well, let me ask you.

24            MR. BART:  Sure.

25            THE COURT:  The referral department, does -- and

Page 97

1                     Mark Udren - Direct

2    then there's a request for the documents.  You get a referral,

3    you know, this bankruptcy, you're going to do a motion for

4    relief.  And who -- you just identified you have nine, ten

5    attorneys and 130 paraprofessionals.  Is the referral

6    department -- how's the referral department staffed?  Who's

7    acting at this point?

8            THE WITNESS:  So you're asking if a bankruptcy comes

9    in, how do they know what to do with it?

10           THE COURT:  Well, I'm saying you get -- you have the

11   referral department, I guess, is the one that monitors the

12   NewTrak system to see if lo and behold today you got a new

13   referral?

14           THE WITNESS:  Yeah.  For referrals, yes.

15           THE COURT:  Okay.  And then they say, fabulous, we

16   have three.  And then they're going to need certain dates.

17           THE WITNESS:  Right.

18           THE COURT:  So who's making those judgments about

19   what needs to be secured?

20           THE WITNESS:  Well, they have manuals for every

21   department.  So now these people are trained; they don't need

22   to read the manual.

23           THE COURT:  Well, who are the people?  What are

24   their -- I mean, are they attorneys, are they paralegals, are

25   they processors, are they, you know, high school students?  I

Page 98

1                    Mark Udren - Direct

2    mean, I'm just trying to identify how this thing is being

3    handled.

4          THE WITNESS:  I guess I can only answer that by

5    saying that these are people who we've hired, who we have

6    trained to accept these referrals.  They know because we have

7    trained them what documents we need.

8          THE COURT:  I don't doubt that they're not well

9    trained.  Still, you didn't answer my question.  Let me break

10   it down.  Are they attorneys?

11         THE WITNESS:  No.  No, they're not.

12         THE COURT:  Okay.  Are they paralegals?

13         THE WITNESS:  I guess one of the processors.  They

14   don't have certificates of paralegals, if that's what you

15   mean.  No, they're not paralegals.

16         THE COURT:  Okay.  All right.  So they're

17   processors.

18         THE WITNESS:  Yeah, processors.

19         THE COURT:  And what is the background and training

20   of a processor?

21         THE WITNESS:  Well, the backgrounds vary.  You know,

22   equal opportunities.  I mean, whoever comes in and qualifies.

23   You know, we interview them.  If we like them, we think they

24   have the intelligence and the work ethic, which are the two

25   things that the presiding department is required to inquire

1                          Mark Udren - Direct

2    then we hire them.  We hire them for specific departments.

3    And then the manager of that department begins the training

4    process.  They're not put out on their own until the manager

5    of that department is satisfied they understand what they need

6    to do.

7               THE COURT:  Okay.  Go ahead.

8               MR. BART:  All right.

9    BY MR. BART:

10   **Q.**   I think that you should describe the background and

11   qualifications of the managers who are supervising this work.

12   A.    Well, you know, it varies on the different departments.

13   Many of the managers are people that started out at one level

14   and proved to be the cream which rises to the top and got

15   promoted into positions that they have.  My operations

16   manager, for example, started with me from the beginning and

17   has proven to be a most efficient and intelligent and so she

18   is the operations manager.  I have a Pennsylvania foreclosure

19   manager.  I have a New Jersey foreclosure manager.  I have an

20   REO manager.  I have a bankruptcy manager.  I have a title

21   manager.

22               THE COURT:  Well, let's -- maybe it would be helpful

23   if we weren't so hypothetical here and we kind of try and

24   focus the inquiry of the process -- you know, unless the

25   trustee feels otherwise -- to bankruptcy.  'Cause, quite

Page 100

1                    Mark Udren - Direct

2   frankly, that's what this is all about.  And it might be

3   easier for Mr. Udren to answer questions.  So if we're talking

4   about who's the manager of the department, maybe we're

5   thinking about the manager of the department that would get a

6   referral on a bankruptcy matter.

7           THE WITNESS:  Okay.

8   Q.   Can you give a name?

9   A.   Yeah.  The --

10          THE COURT:  I don't care about the name so much as

11  that you were asked about the qualifications.  So he says they

12  vary but if we focus it in a little bit, maybe it'll be easier

13  to answer.

14  A.   Okay.  Well, the manager of the bankruptcy department

15  worked for one of the -- I think it was GMAC for, I believe,

16  fifteen, twenty years.  And she came from another lending

17  office.  And we were very fortunate to get her.  She's very

18  knowledgeable and very efficient, very organized.  Understands

19  the process of both bankruptcy and foreclosure for that

20  matter.  She was, of course, trained by the management that I

21  had in place.  We were satisfied that she understood the

22  processes.  She learned how to use NewTrak.  She understood

23  all the processes.  And now she manages probably twenty to

24  twenty-five people to see that things run smoothly.

25          THE COURT:  But she's not a lawyer.

Page 101

1                          Mark Udren - Direct

2              THE WITNESS:  No, she's not.

3              MR. BART:  All right.

4              THE COURT:  Okay.

5    **Q.**   We heard from Mr. Fitzgibbon in this case.   Mr.

6    Fitzgibbon was a relatively new attorney, was he not?

7    A.    Yes.

8    **Q.**   What is the firm's policy and procedures when it comes to

9    training new attorneys such as Mr. Fitzgibbon.

10   A.    Well, as a preamble, we had to experience bankruptcy

11   attorneys who both left pretty much at the same time.   It was

12   just a coincidence, I believe.   And, you know, they each had

13   their own lives they wanted to pursue elsewhere.   So we were

14   really left without the two primary bankruptcy attorneys that

15   had been performing our services for us.   However, we still

16   had senior attorneys in the office, one of whom is Ms. Doyle.

17   We started a process to hire attorneys.   We hired Mr.

18   Fitzgibbon.   We hired actually three other attorneys one of

19   whom -- so, by way of example, Ms. Doyle came into court with

20   one of the attorneys, had to present a motion that we were

21   requested to -- and he just wasn't able to do it very well.

22   And she came back and reported and unfortunately we had to

23   terminate that attorney.   He wasn't able to really perform up

24   to standards we required.   She came with Mr. Fitzgibbon,

25   watched him perform on several occasions, decided that he was

Page 102

1                          Mark Udren - Direct

2    competent.  She went through the process with him.  She

3    reviewed his documents.  She taught him really what he needed

4    to know.  And he was not set loose on his own until she was

5    satisfied that he was able to handle it almost like a

6    preceptor concept of -- those of us who go back that far.

7                    THE COURT:  Ms. Doyle, that is?  You're talking

8    about Ms. Doyle --

9                    THE WITNESS:  Ms. Doyle worked with Mr. Fitzgibbon,

10   certainly.  And she's twenty, twenty-five years experience.  I

11   was comfortable with her.

12   Q.   All right.  And you've had an opportunity to review the

13   transcripts of the May and June hearings?

14   A.   Yes.

15   Q.   Okay.  And you were here in the proceeding where Ms.

16   Graves testified, correct?

17   A.   Yes.

18   Q.   And you've had an opportunity -- have you had an

19   opportunity to review the transcript of Mr. Fitzgibbon's

20   testimony?

21   A.   Yes, I did -- I did look at it.

22   Q.   Okay.

23                    MR. BART:  I don't know, Your Honor, how much you

24   want me to go through the history of what happened with Mr.

25   Udren because his is going to be second-hand in terms of the

Page 103

1                          Mark Udren - Direct

2    relief from stay motion and what transpired.  I can have Mr.

3    Udren testify as to his opinions and testify for the firm

4    about what happened.  But I want to leave that to you since

5    this is your inquiry primarily.  Would you want to hear from

6    Mr. Udren as to his opinions?

7          THE COURT:  Well, I don't know what his -- I mean,

8    you know what the nature of the questions that I had are.  I

9    don't know how much he gets involved in the weeds of the

10   office.  I know I had wanted to know how the firm was managed

11   so that I understood what kind of directives were being given

12   to attorneys.  The question that has not been sufficiently

13   answered for my purposes is why -- what I have heard -- and

14   I'll put it on the table.  I mean, this is not a adversarial

15   in my view.  You know, why when the HSBC testifies that --

16   representative testifies that the NewTrak system has a

17   capacity for escalation in the event that information is not

18   forthcoming that would satisfy a request from the Court, why

19   Mr. Fitzgibbons believed that he was not free to utilize it.

20   And that's a firm question.

21          MR. BART:  All right.  May I answer that from --

22          THE COURT:  And, you know -- yeah.

23          MR. BART:  Okay.

24          THE COURT:  You personally or him?

25          MR. BART:  Well --

Page 104

1                      Mark Udren - Direct

2          THE COURT:  You don't know because you don't work at

3    the firm.

4          MR. BART:  I don't work at the firm but I was here

5    to hear Mr. Fitzgibbon's testimony of --

6          THE COURT:  Well, I'm not asking for argument.  I

7    heard his testimony --

8          MR. BART:  Fine.

9          THE COURT:  -- and for all I know, I don't know what

10   really happened or -- but you may have been there to hear his

11   testimony after he had met with you and after all this had

12   transpired.  I was in court when he stood here at the bar and

13   told me he couldn't get information from the system --

14         MR. BART:  All right.

15         THE COURT:  -- even though he had -- you know, I

16   never heard that he improperly utilized it.  He sort of

17   inferred that maybe you didn't ask for the right thing.  I

18   mean, if what we're basically saying now is this is all much

19   ado about nothing because Mr. Fitzgibbon didn't properly

20   communicate then -- which is, I think, where you're kind of

21   trying to go, I was here and made things very clear to him.

22   And he made things very clear to me.  And I do agree.  I think

23   Mr. Fitzgibbon does a nice job and he's trained.  So that has

24   still not been answered to my satisfaction.

25         MR. BART:  All right.  I don't know that Mr. Udren

1                    Mark Udren - Direct

2   is the person --

3           THE COURT:  And if he doesn't have the --

4           MR. BART:  Right.

5           THE COURT:  -- foggiest notion because this all --

6           MR. BART:  I mean, all he could say is he's reviewed

7   the file and these are his conclusions.

8           THE COURT:  Well, then the U.S. trustee examine and

9   find out what the U.S. trustee is trying to find out.

10          MR. BART:  Okay.

11          THE COURT:  I --

12          MR. BART:  Let me ask one more.

13          THE COURT:  He doesn't know anything special about

14  NewTrak.  I have the -- I still don't -- well --

15          MR. BART:  Well, let me just ask him --

16  BY MR. BART:

17  Q.   What is the escalation policy that's been referred to?

18  A.   You know, I've heard throughout this that he was unable

19  to speak to the client, that Fidelity blocks -- that's just so

20  untrue.  It's just not the case.  There's nobody in the

21  office.  When I say nobody, there's certain processors that

22  can't call the clients for obvious reasons.  But there's no

23  attorney in the office that can't pick up the phone and speak

24  to any client any time they want.  Mr. Fitzgibbon,

25  unfortunately, is a young energetic attorney who's six months

1                           Mark Udren - Direct

2    into this.  And I think that as a young attorney -- I mean,

3    I've sort of forgiven him.  It's not for me to forgive him on

4    your behalf but he misspoke.  He didn't understand the

5    escalation policy.  And I think he didn't really come to me or

6    Lorraine Doyle or any of the other attorneys to say hey, what

7    can I do.  I'm not getting what I need.  That's what he should

8    have done.  That's what's in the manual.  That's what he's

9    told.  And I think he just --

10             THE COURT:  What manual?

11             THE WITNESS:  We have manuals, procedure manuals,

12   for every department for every county in the state, how

13   everything is -- 'cause sixty-seven counties, everybody does

14   everything different.

15             THE COURT:  So if I were to ask you for your manual

16   that he had accessible --

17             THE WITNESS:  I'm sure.

18             THE COURT:  -- that tells him when you can't get a

19   loan history and it comes back and it's different than the

20   Court is requesting that you can pick up the phone and call --

21   a young attorney can pick up and call the client.

22             THE WITNESS:  Your Honor, I think he misunderstood

23   what you were asking.  He didn't purposely not give you what

24   you wanted.  I mean, he wouldn't do that.  None of us would do

25   that.

1                    Mark Udren - Direct

2          THE COURT:  I know that.

3          THE WITNESS:  He would give you what you wanted.  I

4    mean, he misunderstood --

5          THE COURT:  He would give me --

6          THE WITNESS:  -- what he was asking for.  They

7    misunderstood what he was asking for.  You know, when it got

8    confused enough for him to come to me or any of the other

9    attorneys to ask for help --

10         THE COURT:  Well, you're --

11         THE COURT:  I wish he had.  He's supposed to.  And

12   he knows that now.  But it's an act of omission not

13   commission.

14         THE COURT:  I believe you.  I do not have any

15   adverse views about Mr. Fitzgibbon.  You know, this is not

16   about Mr. Fitzgibbon.  This is about when attorneys stand up

17   in this Court and they've been asked to provide loan histories

18   and they can't get it.  And it's not just -- if it was one

19   young attorney who was having a problem that would be one

20   thing.  We wouldn't have done all this if it was one young

21   attorney who didn't know that he could do this.  But I have

22   attorneys that stand here week after week and can't get loan

23   histories.  I've just sat through an hour and a half of this

24   system which is telling me that they should be able to get it

25   not in thirty days, which is the time your attorneys always