1                   Mark Udren - Direct

2   ask for, but they should be able to get it the next day.

3           THE WITNESS:  Your Honor, I can't speak to the

4   attorneys day after day.  I can only speak to Mr. Fitzgibbon.

5           THE COURT:  Well, you don't deal with the system so

6   I don't know that you can answer any of this.

7           THE WITNESS:  In terms of Mr. Fitzgibbon, I don't

8   know that he understood what he --

9           THE COURT:  Well, you don't know what he understood.

10          THE WITNESS:  -- was supposed to get.  Well, I mean,

11  I read the notes of testimony.

12          THE COURT:  Well, I could read the notes of

13  testimony also.  So you don't really have anything other

14  than -- anything independent to really say on this.

15  BY MR. BART:

16  Q.   In reviewing the file after the June hearing, the loan

17  history was provided within, I believe, two days, was it not?

18  A.   Right.  It was.

19  Q.   All right.  And there's no more I really need to add

20  about that.  And the loan history was obtained through the

21  NewTrak system?

22  A.   Yes, it was.

23          MR. BART:  Why don't we let the U.S. trustee ask his

24  questions, Your Honor?

25          THE COURT:  Yeah.

1                  Mark Udren - Cross

2          MR. CONWAY:  Thank you.  Your Honor, may I be

3   allowed to remain seated to examine --

4          THE COURT:  Yeah, yeah.

5          MR. CONWAY:  -- Mr. Udren?  Thank you.

6                      CROSS-EXAMINATION

7   BY MR. CONWAY:

8   Q.   Mr. Udren, who was your client in the Taylor case?

9   A.   In the Taylor case?

10  Q.   Yeah.

11  A.   HSBC.

12  Q.   Did you have a separate written fee agreement with HSBC?

13  A.   Certainly.

14  Q.   Do you have a written agreement with LPS?  Us?

15  A.   Yes, certainly.

16  Q.   Okay.  Which came first, your agreement in relationship

17  with HSBC or your relationship with Fidelity?

18  A.   I'd have to look at the history but I believe HSBC.  I

19  represented them since I -- since the very beginning when they

20  were Marine Midlin Bank.  So I would have to say HSBC.

21  Q.   Is it your -- does your agreement with Fidelity set fees

22  that you charged to HSBC?

23  A.   No.  Well, maybe they -- they do but they're fees that

24  HSBC has requested.  You know, I don't know.  Can I look?

25  Q.   That was going to be my next suggestion.

1                    Mark Udren - Cross

2  A.   Um-hmm.  Yes, there are fees set forth.

3  Q.   Is your fee -- do you get a different agreement which --

4  Fidelity for a different lender?

5  A.   I'm sorry?  Do I get a different --

6  Q.   So you represent, say, Wells Fargo and they use Fidelity

7  system.

8  A.   Right.

9  Q.   Just as a hypothetical, would you get a different

10 agreement with Fidelity or would that same agreement govern?

11 A.   I would get an agreement from, using your example, Wells

12 Fargo just like I would from HSBC, separate --

13 Q.   I'm --

14 A.   -- separate from Fidelity.

15 Q.   So, is it fair to say that as to using Fidelity's system

16 to service Wells Fargo, you would use that same agreement that

17 you use vis-a-vis HSBC?

18 A.   Are you saying that if I have ten clients and they're all

19 with Fidelity, does Fidelity just have one contract --

20 Q.   Yes.

21 A.   -- with me?

22 Q.   Yes.

23 A.   Yes.

24 Q.   So that Fidelity contract which sets your fees --

25 A.   Well -

1       Mark Udren - Cross

2  Q.  -- sets it for all those clients.

3  A.  Um-hmm.

4  Q.  Is that correct?

5  A.  Well, the clients are pretty uniform because they --

6  Q.  That's not what I'm asking you, sir.

7       MR. CASH:  Your Honor, I know that I'm not a party
8  to this case but since it's our system that's under attack,
9  I'd like to object to the question because there's a
10 difference between contract and that schedules.  And I think
11 it mischaracterizes and it's a misleading question.  There's
12 one contract but there's separate schedules.

13      THE WITNESS:  That's correct.  Thank you, Mr. Cash.
14 BY MR. CONWAY:

15 Q.  So then --

16      THE COURT:  Okay.  You're clarifying.

17      MR. CASH:  Thank you, Your Honor.

18 Q.  So then there are separate schedules to the Fidelity
19 contract depending on the --

20 A.  On the client, correct.

21 Q.  -- client?

22      MR. CONWAY:  I didn't understand that.  Thank you,
23 Mr. Cash.

24 Q.  Is it your agreement with Fidelity that determines the
25 timeline for the actions, particularly in this case for HSBC?

1              Mark Udren - Cross

2  In other words, you get a referral to file a stay relief

3  motion and you have so many days to do it in?

4  A.   Right.

5  Q.   So is it the Fidelity agreement that sets those

6  timeline --

7  A.   Is that Fidelity driven?

8  Q.   -- parameters?

9  A.   I think it's client driven. And I think the clients get

10 it from Fannie Mae and Freddie Mac. I mean, those are the

11 standards they usually rely on.

12 Q.   Well, are they set forth in the agreement with Fidelity?

13 A.   What's that? The timelines?

14 Q.   Yeah.

15 A.   I don't believe they are. I don't know. Are they? I'll

16 look. I mean, did you see them? 'Cause I don't recall seeing

17 the timelines in this.

18 Q.   I'm asking you, sir.

19         THE COURT: Well, the document --

20         THE WITNESS: The document speaks for itself.

21         THE COURT: If he doesn't know, we can all look at

22 the document.

23         THE WITNESS: I'm going through the documents. I

24 don't see anything with regard to timelines. So the answer

25 would be with what I have in front of me, no. No.

1          Mark Udren - Cross

2  BY MR. CONWAY:

3  Q.   Who in your office was responsible or -- what attorney in

4  your office was in charge of managing the Taylor case?

5  A.   Lorraine Doyle.

6  Q.   Does the agreement with Fidelity provide Fidelity as the

7  agent of the client?

8  A.   Document again speaks for itself.

9  Q.   But do you know, sir?

10 A.   Does it state it?  I don't --

11 Q.   Do you know?

12 A.   Do I know what?

13 Q.   The answer to that question without referring to the

14 document.

15 A.   Okay.  What is the question, please?

16 Q.   Whether the agreement with Fidelity says that Fidelity is

17 the agent of the client.

18 A.   I don't know if it says it.

19        THE COURT:  Is the agent for -- for whom?

20        MR. CONWAY:  HSBC or whoever the client is.

21        THE COURT:  Oh, for HSBC.

22 A.   Well, without looking --

23 Q.   Without looking, you don't know?

24 A.   No.  But I know they are the agent for the client and

25 that's how I treat them.

1                    Mark Udren - Cross

2  Q.  Does the agreement with Fidelity provide that you are to

3  provide legal services consistent with Fidelity standards and

4  procedures to the client?

5  A.  I hope not.  I mean, I provide services based on the

6  client's requirements.  I don't care what t--

7  Q.  Doesn't the agreement provide that?

8  A.  I doubt that they say it has to be their standards.  I

9  think they want professional standards, I would think.  I

10 mean, without looking at it.  But I don't care what they would

11 require.  I require what the client requires.  And I don't

12 think Fidelity would interfere with that relationship.

13        (Pause)

14 Q.  Would you look at Schedule A or Exhibit A to the

15 agreement?

16 A.  I have the ones that -- the newer ones.

17 Q.  Right.

18 A.  Is that what you want?  I believe there's more than one

19 Exhibit A here.

20           THE COURT:  Was the --

21           MR. CONWAY:  It says Fidelity National Foreclosure

22 Solution Network Schedule --

23           THE COURT:  -- document that's been marked M-14 --

24           MR. BART:  Hold on.  Hold on.

25           THE COURT:  Let's make sure we're working off of the

1                    Mark Udren - Cross

2   same document.  M-14 or Udren 14 is the older one.

3           THE WITNESS:  Right.

4           THE COURT:  Is the superseded one.  So now he's

5   testifying off of a document that's not been marked?

6           THE WITNESS:  No.  I think it's 15.

7           MR. BART:  I believe we did mark that.  It's 15.

8           THE WITNESS:  I think it's marked 15.

9           THE COURT:  Did you mark that?  You did mark that.

10  What is that?  M-15 then?

11          MR. BART:  Yes.

12          THE WITNESS:  Right.

13          MR. CONWAY:  U.

14          MR. BART:  U.

15          THE COURT:  Excuse me.  U-15.  Okay.  U-15 is the

16  current.  Okay.  I just -- you just didn't have another copy

17  of it, that's all.  That's fine.

18  BY MR. CONWAY:

19  Q.  See Section 1 where it says "Services Provided by the

20  Firm to Fidelity"?

21          MR. BART:  You're now referring to the old contract?

22          MR. CONWAY:  No.  This is Exhibit A to the new

23  contract as well, I believe.

24          THE COURT:  It says --

25  A.  Okay.  Is that the one dated March 8th, 2005?

1               Mark Udren - Cross

2   Q. You have the only copy, sir. I'm going from

3   recollection.

4           MR. BART: Do you want a --

5           MR. CONWAY: May I approach, Your Honor?

6           MR. BART: Why don't you?

7           THE COURT: You're talking about Exhibit A?

8           MR. CONWAY: Yes.

9           THE COURT: "Services Provided by Fidelity to the

10  Firm".

11          MR. CONWAY: No. This is "Services Provided by the

12  Firm to Fidelity".

13          THE COURT: Well, Exhibit A --

14          MR. CONWAY: Section 1.

15          THE COURT: Well then, maybe I just don't have the

16  right contract. So I can't follow along. That's not what

17  mine says. But that's okay.

18          UNIDENTIFIED SPEAKER: 322, Your Honor. At the

19  bottom, Tela-322 if yours is Bates-stamped.

20          MR. BART: If --

21          MR. CONWAY: Well, he's

22          THE COURT: But that's the old one.

23          MR. CONWAY: You're looking at the old one. He's

24  looking at the new one. But they are substantially identical,

25  Your Honor, which is Bates-stamped 322.

1                    Mark Udren - Cross

2         THE COURT:  "Services Provided by the Firm to

3    Fidelity".

4         MR. CONWAY:  The firm to Fidelity.

5         THE COURT:  Okay.  Got it.

6    BY MR. CONWAY:

7    Q.   So if you look at that Section 1, paragraph (b).

8    A.   B, yeah.

9    Q.   Does that refresh your recollection as to who sets the

10   standards --

11   A.   I set the standards for my firm.

12   Q.   -- and procedures?  Would you read the first sentence of

13   paragraph (b) of Section 1, sir?

14   A.   "The firm shall provide Fidelity and its clients with

15   legal representation in the manner consistent and in

16   compliance with Fidelity's standards and procedures."  Yeah.

17   Hopefully for them they comply with my procedures because mine

18   trump theirs.

19   Q.   Does your agreement provide that in bankruptcy cases your

20   firm will, upon the request of Fidelity, attend 341 meetings,

21   object to debtor's plan, file a motion for adequate

22   protection, file stay relief motion, process a stipulation,

23   prepare demand letters and process other reasonable requests

24   by Fidelity?

25   A.   I'm sorry.  Where --

1            Mark Udren - Cross

2        MR. BART: May I make an objection, Your Honor? If

3   we're talking about a written document, the document speaks

4   for itself. If he's asking what Mr. Udren's understanding is

5   that's a perfectly proper question.

6        THE COURT: Yeah. I mean, Mr. -- let's not make

7   this, you know, adversarial. You know, you're trying to find

8   something out here. And, he'll answer it or he won't answer

9   it. You can press as hard as you want, Mr. Conway. But --

10       MR. CONWAY: Well, I can ask it in another way. Was

11  he aware that that's what is required under the agreement with

12  Fidelity.

13  A.   I don't know where you are reading so --

14  Q.   You don't need to know where I was reading.

15       THE COURT: Well, are you saying was he aware that's

16  what the document said or do you want him to try and explain

17  how he was living with this contract? I mean, I don't know

18  what you're --

19       MR. CONWAY: Well, that would be my next question.

20       THE COURT: I don't know, quite frankly, what you're

21  trying to --

22       MR. CONWAY: That would be my next question, Your

23  Honor. If he's aware of it. If he's not aware of it, he

24  can't explain how he's living with it.

25       THE COURT: Okay. Well, then, you know --

Page 119

1              Mark Udren - Cross

2   BY MR. CONWAY:

3   Q.   Were you aware of that?

4   A.   I'm not -- I'm lost, please.  What is the question?

5   Q.   Were you aware that the agreement with Fidelity provides

6   that Fidelity -- that you will opine the request Fidelity

7   perform certain services?  Were you aware of that?

8   A.   My understanding is that the client generates the

9   request.  If Fidelity transmits that request, so be it.  But

10  it's client-generated.  That's my understanding.

11  Q.   Are you aware that the agreement provides that you, your

12  firm, will follow the time frames and the communication

13  requirements as provided by Fidelity?

14  A.   I have my own time frames.  I set the time frames for

15  myself.

16  Q.   I understand that, sir.  I'm asking you if you were --

17  A.   It happens that there happened to be --

18  Q.   -- aware --

19  A.   Pardon me?

20  Q.   Are you aware that the agreement provides Fidelity will

21  set the time frames?

22  A.   As far as I know, Fidelity follows their clients'

23  requirements.  That's my understanding.

24          MR. CONWAY:  Could you direct the question -- the

25  witness --

1                    Mark Udren - Cross

2   A.    Because my non -- my non-Fidelity --

3           THE COURT:  I think he's answering it, Mr. Conway.

4           THE WITNESS:  I don't know if you want me to sit

5   here or not.

6   Q.    Where do you get this understanding from, sir?

7   A.    Which understanding is that?

8   Q.    That your client sets the time frames, that the client

9   makes the request through Fidelity.  Where do you get that

10  understanding?

11  A.    I have many non-Fidelity clients.  They set time frame

12  standards which we have to --

13  Q.    Where -- I understand that.

14  A.    And they've actually -- they're similar to the ones that

15  Fidelity transmits from their clients to us.

16  Q.    Where do you get the understanding that your Fidelity

17  clients set the time frame and not Fidelity?

18  A.    Where do I get that understanding?

19  Q.    Yeah.

20  A.    I guess -- I guess maybe I'm delusional?  I don't know.

21  I mean, I don't know how to answer that question.  How do I

22  get the understanding?  Fidelity has always indicated that the

23  client is our client.  It's also Fidelity's client, well,

24  that's nice.  But I answer to the client not to Fidelity.  I

25  mean, if given the choice between Fidelity wants me to do one

1          Mark Udren - Cross

2  thing and the client wants me to do something else, Fidelity

3  doesn't count.  If I want to communicate with the client, I

4  communicate with the client whether Fidelity wants me to or

5  not.  That's where my understanding, I guess, comes from.

6  Q.  Is part of Fidelity's obligations, under their agreement

7  with you, to develop marketing services to obtain clients for

8  their network?

9  A.  I wish it were.  I mean, I don't know that.  I mean,

10 frankly, they've taken on clients that once they took them on,

11 I lost them.  So, you know, I mean, I don't think they market

12 on my behalf.  I market on my own behalf.

13         THE COURT:  Well, what are you saying?  Does

14 Fidelity require the Udren firm to do marketing for Fidelity?

15 Is that the question?

16         MR. CONWAY:  No.

17 Q.  I'm trying to find out if Fidelity is doing marketing for

18 the Udren firm --

19         THE COURT:  Oh, okay.

20 Q.  -- and getting you clients.

21 A.  Absolutely -- to my knowledge, absolutely not.

22 Q.  Does Fidelity oversee the process in connection with the

23 bankruptcy, that is, the plan process?

24 A.  Do they oversee it?

25 Q.  Yeah.

1          Mark Udren - Cross

2  A.   I think you'd have to ask them.  I don't know.

3  Q.   Well, you work through them.  Do they give you --

4  A.   But I don't know what they do.

5  Q.   -- oversight?

6  A.   Do they have oversight?

7  Q.   Do they give you oversight in the administration of a
8  bankruptcy case?

9          MR. BART:  I'm just going to object to "you work
10 through them".  I don't think that's accurate.

11         THE COURT:  Well, let me ask you a question because
12 this is -- we just heard an hour and a half, an hour and
13 three-quarters of what Fidelity contends is the process what
14 they do with their system.  Now, that wasn't done as -- it was
15 done by way of a demonstration.  It wasn't done under oath.
16 It wasn't done -- the trustee was free to ask informal -- or
17 ask any questions.  I'm beginning to sense where you're going
18 with this, Mr. Conway.  And, number one, continue and have him
19 answer to the best that he can.  But I don't know whether your
20 question shouldn't be directed -- I don't know whether you
21 need them to answer these questions.  I mean, they're just to
22 say basically what they said not under oath under oath.
23 Because I think from their perspective, I've gotten answers.
24 But I don't know whether they satisfy you.

25         MR. CONWAY:  Well, part of this Court's inquiry was

1          Mark Udren - Cross

2  to see if the attorneys and their agents and the --

3          THE COURT: yeah.

4          MR. CONWAY: -- lender acted appropriately and

5  whether sanctions should be imposed. And not to hide the

6  ball, it seems to me that the Udren is driven by what is right

7  in the contract whereby the Fidelity is overseeing and

8  directing the actions to be taken in the process.

9          THE COURT: But he's just said otherwise. And quite

10 frankly, I could come up with another explanation. I mean, I

11 could read that another way, too, but I'm not testifying. So

12 he doesn't see it that way. The document says what it does

13 say and he's saying that's not how he operated his law firm.

14 You're saying well, you signed a contract with them that says

15 this and --

16         MR. CONWAY: Well, I'm trying to find out how he

17 operated the law firm --

18         THE COURT: Well, then, then fine.

19         MR. CONWAY: -- whether he operated it in accord

20 with the contract or not.

21         THE COURT: Then that's what he's saying. He's

22 saying that they may have said that we haven't maintained

23 their standards but I maintained my own standards which I feel

24 were higher or something, I don't know.

25         THE WITNESS: Your Honor, if I could explain. You

1                    Mark Udren - Cross

2  know, maybe this example will help. When we interviewed for

3  the designated accounts over Freddie Mac about ten years ago,

4  there were certain acceptable standards in the state of

5  Pennsylvania for how long a foreclosure should take and where

6  they came from -- you know, maybe they came from heaven, I

7  don't know. But those were the standards then. Freddie Mac

8  came in and said look, we want -- we want things better.

9  We're going to help you make them better but we want things

10 faster. So they set new time frames. And they were really

11 quite a bit shorter than the existent time frames. But they

12 talked to us and they said can you do this faster if we allow

13 you to do that. Can you do this faster if we allow you to do

14 that? So, for example, to do a skip trace, so if you can't

15 find somebody for service, you would have it and you could

16 save weeks doing that. They said we'll pay for that skip

17 trace even if you don't need it. Well, we knocked two weeks

18 or whatever off those time frames. And we went through the

19 whole process like that. I adopted those time frames for my

20 office 'cause they were the best time frames out there. And

21 in my opinion, my best marketing tool was to go out and show

22 those clients these time frames because that's what drives the

23 clients, time frames. And legal competency of which we are.

24 But time frames. And so that -- those time frames -- we went,

25 we printed them up. I'll show them to you. We had it in our