1                      Mark Udren - Cross

2    marketing brochure.  Those are the time frames that we set for

3    ourselves.  It so happens that they're better than Fidelity's,

4    I think.  And so, I don't really give a hoot what Fidelity

5    says because we're not going to slow down 'cause they allow us

6    to.  We are time frame driven and if Fidelity goes into it,

7    client -- and the client says who's your fastest attorney,

8    they have to say well, look here, these guys are a week and

9    these guys are two weeks and these guys are three weeks.  The

10   client says I want the fastest.  Yeah, here I am.  And that's

11   what motivates me.  That's what drives me.  Not Fidelity.  Not

12   Fidelity's contracts.  Fidelity is an assistant to me.  The

13   NewTrak is an assistance to me.  That's all they are to me.

14   And there's -- and Fidelity's not the only one out there.

15   There's a number of companies like Fidelity's that

16   outsource --

17              THE COURT:  But you just said something that was

18   curious and it sort of contradicts what I heard before.  You

19   said your times are better than Fidelity's.

20              THE WITNESS:  They may be.

21              THE COURT:  And I'm trying to understand whether

22   Fidelity is giving you time frames even if you are surpassing

23   them.

24              THE WITNESS:  Well --

25              THE COURT:  That's what Mr. Conway is trying to

1                          Mark Udren - Cross

2    determine.

3              THE WITNESS: All right. You know, the truth is I

4    look and I don't see them.  I mean, he's indicating that

5    they're in there so I'm assuming maybe they are.  But,

6    frankly, I haven't seen them.  I don't know that I've ever

7    seen them.  I don't know if Fidelity has time frames.  I mean,

8    Mr. Conway indicated that there was something in here that

9    maybe showed time frames.  I haven't found it.  But it doesn't

10   matter to me because their time frames cannot be better than

11   mine.  Whatever they think would be allowable, whatever their

12   clients accept out there, they're not as tough as the Freddie

13   Macs and those are the ones that we follow 'cause they're the

14   toughest out there.

15   BY MR. CONWAY:

16   Q.   Mr. Udren, do your attorneys have access to the NewTrak

17   system?  Can they go on it?

18   A.   Oh, absolutely.

19   Q.   Did you take the time to review the various screens and

20   the communications that occurred in the Taylor case through

21   Fidelity system?

22   A.   You know, unfortunately, I didn't.  I have to say that

23   NewTrak is beyond my capabilities.  Just as the IPhone is

24   beyond my capabilities and many other new electronic devices,

25   I did not, no.

1                          Mark Udren - Cross

2   Q.   Are you aware that your associate, Mr. Fitzgibbons,

3   whether he ever made an entry or a request or opened an issue

4   himself personally on the system?

5   A.   I believe he did.

6   Q.   You believe he did?

7   A.   I think there was testimony indicating that -- that he

8   had.

9   Q.   Well, certainly he represented that to the Court.  I'm

10  asking you if you have personal knowledge of whether he in

11  fact did it.

12  A.   No, I don't.

13             THE COURT:  Do all your attorneys have access to

14  NewTrak, the same access?

15             THE WITNESS:  Yes, they do.  And they also have the

16  escalation list.  They can call any client they want.

17  Q.   Who in your office would have -- be familiar with NewTrak

18  Fidelity system to be able to answer questions as to whether

19  and what Mr. Fitzgibbons put on the system?

20  A.   Well, all the managers are very capable.  I mean, you

21  know, my office operations manager is probably the most

22  capable.  Then, you know, the Pennsylvania foreclosure

23  manager -- or Pennsylvania office manager probably is my main

24  computer network expert we have.

25  Q.   Well, are any of the personnel assigned in your office by

1                     Mark Udren - Cross

2   case?  In other words, would so many people be assigned to the

3   Taylor case?

4   A.   No.  That's not how it's broken down.

5   Q.   Who is your --

6   A.   I mean, litigation is broken down like that.  Attorneys

7   are assigned litigation files by attorney.  But if a matter is

8   going uncontested then it's really handled by paralegals and

9   processors.

10  Q.   Who is your office manager in Philadelphia -- or

11  Pennsylvania?

12  A.   The operations manager is a Tina Rich.

13  Q.   And she would have access to understand and be familiar

14  with the entries in the Taylor case --

15  A.   If she looked at them --

16  Q.   -- is that correct?

17  A.   -- yes, she'd understand them.

18  Q.   Do you know whether --

19          MR. CONWAY:  Strike that.  You don't know.

20  Q.   Your firm do the foreclosure?

21  A.   On Taylor?

22  Q.   On Taylor, yeah.

23  A.   I don't -- I don't know.

24  Q.   You don't know?

25  A.   No.  Most likely because they're doing a lot of cradle

1                    Mark Udren - Cross

2   the grave now.  So if there was a foreclosure, I wouldn't

3   expect that we -- as a matter of fact, now that I think about

4   it, I think we did do the foreclosure, yes, now that I think

5   about it.  Because actually, some payments went to sales --

6   insurance sales department by mistake.  And I suppose they got

7   this woman's name because of the matter had been listed for a

8   sheriff's sale.  So the answer is yes, we did do the

9   foreclosure.

10  Q.   Do you know how much you charged?

11  A.   Fannie Mae rate.  Whatever our agreement is with HSBC.

12  Q.   I'm asking if you know in dollars and cents what you

13  charged.

14  A.   Specifically on that foreclosure?

15  Q.   Yeah.

16  A.   I don't.  I would guess it would be 1250.

17  Q.   If I were to show you the proof of claim that was filed

18  in this case for attorneys' fees and ask you to break down the

19  charges, could you do that?

20  A.   Without seeing it, I -- you know, I mean, I assume I

21  could, yeah.

22        MR. BART:  May I just get a foundation of what Mr.

23  Udren's breakdown of attorneys' fees --

24        THE COURT:  Show Mr. Bart what it is that you will

25  show him.

1                    Mark Udren - Cross

2          MR. BART:  I'm just saying I would think that the

3   foreclosure judgment itself would be -- I mean, 'cause the

4   testimony is that the Udren firm did not prepare the proof of

5   claim.  The Udren firm -- and in a prior proceeding.

6          THE COURT:  So, in other words, you're objecting on

7   the grounds of relevance?  Or you just want an offer of proof?

8          MR. BART:  I want an offer of proof of what this has

9   to do with the Cohen investigation and why this piece of

10  evidence will lead to the development of relevant evidence.

11         MR. CONWAY:  It doesn't go to upsetting the

12  judgment, Your Honor.

13         THE COURT:  No, no, no.  It --

14         MR. CONWAY:  It goes to what is -- and the accuracy

15  of the proof of claim.

16         THE COURT:  But his point is that they didn't do the

17  proof of claim.

18         MR. CONWAY:  But it has to do with the charges.  I

19  want a breakdown --

20         THE COURT:  The charges that have been --

21         MR. CONWAY:  Transferred into the proof of claim.

22         THE COURT:  -- transferred into the system to be on

23  the proof of claim?

24         MR. BART:  Is he saying -- is the point that you're

25  going to say that it is different from the amount of charges

Page 131

1                          Mark Udren - Cross

2    that were entered as part of the judgment in the state court?

3               MR. CONWAY:  No.  That's irrelevant to my inquiry.

4               MR. EISENBERG:  Your Honor, I'm going to object

5    because we're talking about different proof of claims now.

6    There's an allowed proof of claim that's been entered in this

7    case versus the prior proof of claims.

8               THE COURT:  I know that -- explain what you're

9    trying to ascertain.  I think I know but go ahead and

10   articulate it so Mr. Bart will know what you're --

11              MR. CONWAY:  I'm trying to ascertain what the actual

12   charges were versus what they were on the proof of claim, and

13   particularly, the breakdown because I'm trying to see the

14   derivative of where the fees -- or where the costs were in

15   play vis-a-vis those foreclosure charges.

16              THE COURT:  Where they were what?

17              MR. CONWAY:  How the costs break down.  Whether

18   there were costs added to the foreclosure costs that are

19   contained in the proof of claim, contained in the judgment

20   because of whatever.  I don't know where those costs come

21   from.  And I'm trying to understand where they come from.

22              THE WITNESS:  I don't know whatever is.

23              MR. EISENBERG:  Your Honor --

24              THE WITNESS:  I mean, I'll -- I guess, I'll wait for

25   my attorney to indicate whether I should --

Page 132

1                    Mark Udren - Cross

2          MR. BART:  Well, I just don't understand where this

3    is going vis-a-vis the Udren firm.  I mean, the Moss firm

4    already had somebody up there.

5          THE COURT:  Oh, he's -- I think what he's getting at

6    is that he thinks that the proof of claim may contain numbers

7    that are correct which may be so.  But Mr. Eisenberg is

8    basically -- unless you're saying there's a systemic problem

9    about putting numbers into proofs of claim from their office

10   into the system which is accessed by Moss.  I don't really

11   know -- I mean, as far whether he was --

12         MR. BART:  If he can answer it --

13         THE COURT:  The claim was --

14         MR. BART:  -- I'll let him answer it.

15         THE COURT:  -- objected to and it's been resolved.

16         MR. BART:  Right.

17         THE COURT:  So maybe it was the wrong number.

18         MR. CONWAY:  Your Honor, the wrong number is not at

19   issue.  I asked him if he could break it down and he said he

20   didn't know without seeing so I'm trying to give him the proof

21   of claim to show him what the number was so he can tell me

22   whether he can break it down.

23         THE COURT:  Well, his attorney was asking why it

24   needed to be broken down.

25         MR. CONWAY:  Because I want to see if there are

 1                     Mark Udren - Cross

 2    charges that are passed onto the debtor relating to the

 3    NewTrak system that are not disclosed.

 4              THE WITNESS:  I can answer that.  Absolutely not.

 5              MR. EISENBERG:  Your Honor, if that's the question,

 6    just ask him.

 7              THE WITNESS:  Yeah.  Ask me that and I'll answer it.

 8    Absolutely not.

 9              MR. CONWAY:  Well, I think I'm --

10              THE COURT:  Yeah.  Okay.  We're just trying to tie

11    it in.  And you just have but it just took a while to get

12    there.  And you were going to work up so that then you could

13    make the connection.  But --

14              MR. CONWAY:  Yeah.

15              THE COURT:  --this is where he's going.  If this is

16    how he has to get there then maybe he needs to -- it's hard

17    for him to -- if he doesn't know what the charges are then how

18    can he answer Mr. Conway's question?

19              THE WITNESS:  Your Honor, I can -- I can answer

20    one -- if where he's going -- and that is we do not pass on

21    the NewTrak charges.  We just do not.  That's a cost to us.

22    We understand it just like the electric company and our copier

23    company and every other cost.  We charge the standard -- when

24    I say standard, the accepted industry rate.  If it's Fannie

25    Mae and it's 1250 dollars, that's what we charge.  We don't

Page 134

1                            Colloquy

2   charge a nickel over for anything that Fidelity does.  And we

3   never have.  We know that that's inappropriate and we don't do

4   it.

5            MR. CONWAY:  May I have a minute, Your Honor?

6       (Pause)

7            MR. CONWAY:  Your Honor, it's clear to me that Mr.

8   Udren is not the competent witness for me to continue my

9   examination.  I need to --

10           THE COURT:  Can I ask him a few questions?

11           MR. CONWAY:  Well, I'd like to finish what I --

12           THE COURT:  Oh, okay.  I thought you were ready to

13  move --

14           MR. CONWAY:  I'd like to know -- there were certain

15  things that happened in this case.  I know -- if I may say

16  this without violating.  I know that certain things happened

17  that I need someone who is familiar with the entries on

18  NewTrak to testify to.

19           THE COURT:  I think that would be very helpful.

20           MR. CONWAY:  And he's not competent to do that.

21           THE COURT:  Yeah.  Yeah.  I think that's right.

22           MR. CONWAY:  I also note that there's certain things

23  or ways and parameters that this case was conducted in and he

24  didn't handle the case and he's not familiar with what

25  happened.  And I need someone else to testify to that.

Page 135

```
 1                         Colloquy

 2          THE COURT:  I thought that was exactly where you

 3   would finally end up because he doesn't -- you know, I had

 4   demanded the head of the firm and he's come very dutifully

 5   many times and sat here.  But he's not close enough to this to

 6   really shed very much light.  I have one question on the

 7   contract which perhaps he will know the answer.  But he knows

 8   how things perhaps should be handled whether -- how they were

 9   handled.  And I don't whether Ms. Doyle is the person.  I

10   don't know whether -- she's not here today so maybe the next

11   one is.  You know, Ms. Doyle -- I mean, we didn't have the

12   benefit of all this when we had Mr. Fitzgibbon here.  Maybe

13   you want to call him back.  Maybe you want to have one of the

14   operations managers.  I mean, you can find out who the right

15   person is.  But I would totally agree with you.  I mean, Mr.

16   Udren has answered very credibly and frankly his view of

17   things but he's jut not that close to it.  But he came because

18   he was called and I appreciate that.

19          Do you know anything about -- I mean, I assume this

20   contract -- do you sign contracts on behalf of your firm?

21   Would you have signed this contract, the network agreement?  I

22   can't find any signature --

23          THE WITNESS:  Yeah.  I think I did see --

24          MR. CONWAY:  He testified that it was --

25          MR. BART:  Yes.
```

Page 136

```
 1                         Colloquy

 2             THE WITNESS:  I did see my signature --

 3             MR. CONWAY:  He signed it, Your Honor.

 4             THE WITNESS:  -- on this one, yes.

 5             THE COURT:  It's so --

 6             THE WITNESS:  No.  There's a clearer one --

 7             THE COURT:  Yeah.  On one -- I just -- yeah.

 8             THE WITNESS:  -- and I did sign that.  Actually, I

 9   signed both of these.

10             THE COURT:  It looks like -- okay.  So you signed it

11   so you would have reviewed it.  Now, I don't have the latest

12   one and this one is very blurred.

13             THE WITNESS:  I don't think neither of us have the

14   eyes for this.

15             THE COURT:  So I'm trying to read it.  But I have a

16   basic question.

17             THE WITNESS:  Yes.

18             THE COURT:  There are two columns.  It says "Fees

19   billed to client, client amount.  Fees paid by attorney to

20   Fidelity, admin fees."

21             THE WITNESS:  Right.

22             THE COURT:  Now, I can understand why the -- why

23   does the schedule have a list of the fees billed to your

24   client?  Is that -- was an agreement with Fidelity?  I mean,

25   this is an agreement with Fidelity albeit an exhibit to an
```

Page 137

1                              Colloquy

2    agreement.  What is the purpose of that being part of this

3    schedule?

4              THE WITNESS:  My understanding is that the clients

5    tell Fidelity what they're willing to pay for the particular

6    services.  Fidelity sets them forth as the client has directed

7    them.  What their administrative fees are or -- you've heard

8    the testimony.  They are what they are.

9              THE COURT:  Well, I'm not talking about what --

10   well, they said that they don't -- they bill you.

11             THE WITNESS:  Fidelity bills me and I pay Fidelity

12   their required fees.

13             THE COURT:  And that's the column here --

14             THE WITNESS:  Right.

15             THE COURT:  "Fees Paid By Attorney to Fidelity".

16   It's called an admin fee.

17             THE WITNESS:  Right.

18             THE COURT:  And I don't know why it's call an admin

19   fee but I assume it's a fee for administering --

20             THE WITNESS:  Right.

21             THE COURT:  -- whatever they're administering.

22             THE WITNESS:  Right.

23             THE COURT:  What I don't understand -- and then

24   there's a double asterisk that says "No" -- I can't read it.

25   Something "not subject to -- prescribed -- flat fees -- Fannie

Page 138

1                            Colloquy

2   Mae. Fees will apply". I don't know what that has to do

3   with -- do you know what that double asterisk is --

4          THE WITNESS: I'm -- you know, this is such a poor

5   copy I'm not sure I can find it. But without even seeing it,

6   the client will tell them this is what we're willing to pay

7   for a motion for relief. This is what we'll only pay for a

8   motion to reassess damages in a foreclosure.

9          THE COURT: Pay whom? Pay you?

10         THE WITNESS: The client says what they're willing

11  to pay us. See, we're all flat fee. We're flat fee.

12         THE COURT: Okay.

13         THE WITNESS: So their flat fee, the client

14  determines and often they'll follow along Fannie Mae

15  guidelines. But not always. Sometimes they'll pay more.

16  Sometimes they'll pay less. I think from what you just

17  said -- I didn't find where you were reading --

18         THE COURT: Well, look at Exhibit B, Bates 324, and

19  it has two columns: "Fees Billed to the Client" --

20         THE WITNESS: I do see that.

21         THE COURT: And that's what you charge HSBC, right?

22         THE WITNESS: Right.

23         THE COURT: To do whatever -- or what you charge.

24  This is not necessarily -- is this only HSBC or you -- or this

25  is all of your --

Page 139

1                        Colloquy

2          THE WITNESS:  This would be -- yeah.  This is

3    actually HSBC.  But if you'll look, you'll see Freddie Mac.

4    We can charge a thousand.

5          THE COURT:  Okay.  And I understand.

6          THE WITNESS:  For Fannie Mae, we can charge 1300.

7          THE COURT:  So the first column is what you charge

8    your client.  And the second --

9          THE WITNESS:  That's what the client --

10          THE COURT:  -- column is what they charge --

11          THE WITNESS:  Us.

12          THE COURT:  -- you.

13          THE WITNESS:  Right.

14          THE COURT:  What I don't understand is what is the

15    relationship.  And I think that's what Mr. Conway was trying

16    to understand and maybe I'm coming at it in a little different

17    way.  What is -- what I was told by Fidelity is that they have

18    a set fee for all of the tasks and processes, they called

19    them, and presume -- and it wouldn't matter who they were

20    doing it, what client, what attorney.  They are what they are.

21    So they're going to charge, for example, I guess, for handling

22    a foreclosure in a -- I can't read it.  Some type of

23    foreclosure they're going to charge 140 dollars.

24          THE WITNESS:  Right.

25          THE COURT:  You, on the other hand, are going to be

Page 140

1                          Colloquy

2    billing your client 1300 dollars.

3              THE WITNESS:  Right.

4              THE COURT:  Those are two separate fees.  Why is

5    that in the contract schedule?  What is the relevance of what

6    you charge your client, HSBC, to their contract with you if,

7    as you say, there's no relationship between the fees that are

8    paid to them and the amounts you charge your client.

9              MR. CONWAY:  Perhaps put a different way, I believe

10   Mr. Udren's testimony was that Exhibit B changes per different

11   client.  The agreement with Fidelity stays the same but HSBC

12   has one schedule for fees, Wachovia, for example, has another

13   schedule for fees.  And I think what the judge is trying to

14   find out and what I was trying to elicit, does Fidelity's

15   schedule of fees change as well with the fees for a different

16   client.

17             THE WITNESS:  No.  No.  They're the same no matter

18   what.

19             THE COURT:  And that's what I --

20             THE WITNESS:  And you can look at --

21             THE COURT:  -- understood you to say but then I

22   still don't understand why, as part of the schedule, it was

23   important to Fidelity or you to have a schedule that lists the

24   fees that are billed to the client.  Mr. --

25             THE WITNESS:  Your Honor, I can't speak for Fidelity

                 VERITEXT NATIONAL COURT REPORTING COMPANY
                   (215) 241-1000            (888) 777-6690

Page 141

1                          Colloquy

2   other than --

3          THE COURT:  Well, you signed a contract --

4          THE WITNESS:  Right.  Other than --

5          THE COURT:  -- and you provided them with this

6   information.

7          MR. BART:  Objection, Your Honor.

8          THE WITNESS:  I would --

9          MR. BART:  He didn't testify that he provided

10  Fidelity with that information.

11         THE COURT:  Well, it says "Fees Billed to Client" --

12         THE WITNESS:  That's the client.

13         THE COURT:  -- so how would he know what the fees --

14  how would Fidelity know what they bill to a client --

15         THE WITNESS:  The client tells them.

16         THE COURT:  The client tells them?

17         THE WITNESS:  Sure.  The client sent the fees.  I

18  mean, this has to correspondence with the contract I have with

19  HSBC.  If it doesn't correspondent, I have to pick up the

20  phone and call Cheryl and say, look, HSBC said they're going

21  to pay me 1200 dollars for this foreclosure and you have it as

22  850.

23         THE COURT:  Is that because it's built into the

24  system and the cost and fees -- what -- explain it.

25         MR. CASH:  Your Honor, and --

Page 142

1                         Colloquy

2          THE COURT:  I know this is irregular since he's

3  testifying.

4          MR. CASH:  I know.

5          THE COURT:  Do you mind if I ask him?

6          MR. CONWAY:  No, no.  That's one of the things I was

7  trying to get at, Your Honor, because the contract says

8  Fidelity sets the fee.

9          THE COURT:  Well --

10         MR. EISENBERG:  Well, that's not what it says.

11         THE COURT:  I know, but I don't think it says that.

12  But --

13         MR. CASH:  Here's the thing, Your Honor.

14         THE COURT:  But I don't know why it's even there if

15  it's irrelevant.

16         MR. CASH:  Here's what's in the schedule.  One of

17  the functions we do is we monitor the invoices.  The invoices

18  are paid through our system.  What happens in the early -- and

19  there is a schedule which they didn't get.  And HSBC and us

20  have to talk about why they didn't get it but it's exactly

21  what Mr. Conway was talking about is whose duties or what

22  duties and one of the duties of the client is to set the fees

23  per Fannie Mae, federal government, etcetera, etcetera,

24  etcetera.  So at some point, I think it --

25         THE COURT:  And what if they don't?  What do you do?

Page 143

1                          Colloquy

2          MR. CASH:  Well, then if they don't tell us what

3   their maximum fee is then that can't be in the contract.  That

4   is just --

5          THE COURT:  But why does it have to be in the

6   contract?

7          MR. CASH:  Because of part of what we do is we

8   monitor the invoices and they agreed when they entered under

9   our system --

10         THE COURT:  You monitor the invoices for --

11         MR. CASH:  For the client.

12         THE COURT:  -- for the lender to make sure they're

13  not charging more than they are entitled to?

14         MR. CASH:  Yes.  Yes.  And one of the things that

15  they --

16         MR. CONWAY:  They process the invoices as well.

17  They send them to the client for payment.

18         MR. CASH:  Well, no.

19         MR. CONWAY:  No?

20         MR. CASH:  You shouldn't speak of things you don't

21  know.  One of the things that they do and one of the things

22  that I think is important, Your Honor, is that they agree to a

23  maximum.  The client will say we're not going to pay more than

24  this.  And that's part of them signing onto the network is

25  they agree to be capped.  Now, if they're going to go beyond

1                          Colloquy

2   that cap then they're going to have to go to the client.

3   That's not our deal.  But that's part of the contract.  So

4   they understand very clearly what the maximums are.  And it's

5   in that contract with us because they bill through our system.

6   And that's part of the service that, frankly, we do for the

7   lender and, frankly, part of how they get paid more quickly.

8   That's part of what we do.

9           THE COURT:  Okay.

10          MR. CASH:  And it's actually part of the 53103.

11          THE COURT:  Okay.  All right.  Thank you.  All

12  right.  So --

13          MR. CASH:  Now, the problem --

14          THE COURT:  Well, let me see -- are you through with

15  him?

16          MR. CONWAY:  I can't do any more --

17          THE COURT:  Yeah.  I think that's right.  You may

18  step down.

19          THE WITNESS:  All right.  Thank you, Your Honor.  I

20  want to request that, you know, certainly, everyone wants to

21  get to what went on here.  I know that what Mr. Fitzgibbon

22  did -- I mean, if you believe it's sanctionable then that's

23  certainly your determination.

24          THE COURT:  No.  I --

25          THE WITNESS:  But this has been very costly to me.

Page 145

1                          Colloquy

2   I mean, all the down time and everything.

3           THE COURT:  I'm sure it has been.

4           THE WITNESS:  I'm not sure when I look at the case

5   what went on here and what we were requested and what debtor's

6   counsel was supposed to do and didn't do.  And, you know, I

7   can bring Ms. Doyle in.  I can bring Ms. Rich in.  I can bring

8   Mr. Fitzgibbon in.  But this has become a very costly matter

9   for us and I don't know what our relationship with Fidelity,

10  whether it needs to be investigated anymore.  I mean, then I'm

11  the one that should speak to that if the U.S. trustee wants to

12  pursue that more.

13          THE COURT:  Look.  You heard -- you were here on

14  Tuesday?  I don't know, maybe you weren't.  But we -- no,

15  'cause we had the issue with the documents.  My intention

16  here, and I have been trying valiantly and I think that you

17  have heard me say repeatedly I wanted the Udren firm's

18  testimony to be completed so that --

19          THE WITNESS:  Right.

20          THE COURT:  -- this could stop hanging over your

21  head --

22          THE WITNESS:  Really.  And that would be

23  appreciated.

24          THE COURT:  -- and loss time and if things happened,

25  they happened and it is what it is and we're going to find

Page 146

1                          Colloquy

2  out.  Unfortunately, it's been protracted and I'm sorry for

3  that.  But we still haven't finished trying -- I'm just trying

4  to find out what happened here.  What happened here?  And I

5  still -- you know, I -- and you don't know -- and you don't

6  know.

7            THE WITNESS:  No, that's true.

8            THE COURT:  It's unfortunate that you had to sit

9  here all these times only to find out the penultimate time

10 that you really couldn't answer the questions although

11 probably if you had said that in the beginning nobody would

12 have believed you so I guess you had to do it anyway.  But I

13 don't think that it has not been -- I mean, maybe I want to

14 put a positive spin on this.  This process has been expensive

15 for you.  It has been time consuming for the Court.  It has

16 been expensive for Fidelity who's been here constantly and

17 coming from afar and in good faith did the documents, brought

18 in the witnesses and so forth.  It's been costly for HSBC who

19 has a lawyer.  And it's been costly for you.  You have a

20 lawyer.  It's been time consuming for the trustee.  So, yeah.

21 And maybe at the end, everything will be explained.  I think

22 the trustee is right.  We still really don't -- and nobody has

23 gone through what happened.  We have Mr. Fitzgibbons is the

24 only really -- you know -- he gave some testimony.  I have

25 some personal observation.  Maybe it's nothing more than a

Page 147

1                           Colloquy

2   young lawyer that got in over his head.  And I'd be very happy

3   if at the end of the day -- and I really would hope that this

4   doesn't come back if nothing comes of it to hurt him in any

5   way because he's a well meaning young lawyer.  But we're going

6   to take it to its natural conclusion and find out whether it

7   was nothing more than that.  That's your contention.  That's

8   what Mr. Bart says well, when you hear the story, you'll see

9   it was -- well, I still don't understand some of it.  And

10  we'll find it out.  And the sooner we can find it out the

11  better.  Fidelity has been very helpful in the way it produced

12  the documents so that we could get to the bottom of it.  And I

13  really want to do that.

14               MR. BART:  If I may say one thing, Your Honor.  You

15  prevented me from putting on Ms. McDonald-Hamer at the second

16  hearing.

17               THE COURT:  Prevented you?

18               MR. BART:  Yeah, yeah.  I wanted to put her on and

19  you were not really happy with my action.  And I said if you

20  let me do that, I can show you how we got to the June hearing.

21  And I really -- I mean, if you let me, I can do it by way of a

22  submission, a written submission.  The history of this case is

23  extremely clear in that what you had were -- was a debtor's

24  counsel who said that payments were made and they weren't

25  made.  And the Udren firm tried to accommodate that counsel.