## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 13 |
| | : | |
| NILES C. TAYLOR and | : | Bankruptcy No. 07-15385DWS |
| ANGELA J. TAYLOR, | : | |
| | : | |
| Debtors. | : | |

## OPINION

**BY: DIANE WEISS SIGMUND, United States Bankruptcy Judge**

On June 9, 2008 I entered an order to show cause (the "June 9 Order") in response to certain practices of HSBC Mortgage Corp. ("HSBC") and its attorneys and agents, the propriety of which I questioned and which ultimately became the subject of four lengthy evidentiary hearings as described below. The United States Trustee (the "UST") was invited to participate.

In connection with this inquiry, the UST sought discovery of Lender Processing Services, Inc., f/k/a Fidelity National Information Services, Inc.[1] ("LPS" or "Fidelity"). LPS describes itself as "a leading provider of integrated technology and outsourced services

---

[1] On July 2, 2008, LPS was spun-off from Fidelity through a tax free distribution of all of its shares to Fidelity shareholders. Form 10-Q for Lender Processing Services, Inc. http:/biz.yahoo.com/e/080813/lps 10-q.html.

to the lending industry, with market-leading positions in mortgage processing and default management services in the U.S."[2]  Id.  In this case, it served as the intermediary between HSBC and its law firms, the Udren Law Office (the "Udren Firm") and Moss Codilis LLP ("Moss").  The UST's discovery requests were opposed by LPS on confidentiality grounds and resulted in the (1) Motion of the Acting United States Trustee for Rule 2004 Examination (the "UST Motion") of Lender Processing Services, Inc., f/k/a Fidelity National Information Services, Inc.,[3] (2) the UST's Motion for Relief from Order Entered on October 23, 2008 ("Second Vacate Motion") and (3) LPS' Objection to the Second Vacate Motion and Subpoena Issued on February 20, 2008 ("Protection Motion").  Notwithstanding these contested matters, LPS had produced almost all of the Fidelity documents requested by the UST in the UST Motion but pursuant to a non-disclosure requirement memorialized in an order dated October 21, 2008 (the "Confidentiality Order") from which the UST sought to be freed.  LPS did not oppose the use of its documents in this bankruptcy case with appropriate safeguards but objected to the UST's intention to share them with other members of the Office of the United States Trustee in other jurisdictions.

---

[2] LPS represents that 39 of the 50 largest banks in the United States based on 2007 ratings use its services. Its technology solutions include its mortgage processing system (the "MSP") which processes over 50% of all residential mortgages loans by dollar volume. Its outsourcing services include "the default management services, which are used by mortgage lenders and servicers to reduce the expense of managing defaulted loans...."

[3] The UST acknowledged that she did not seek to actually examine a representative of Fidelity but rather sought unrestricted use of the requested documents and a records custodian to authenticate same. Fidelity agreed to certify their authenticity so as to obviate a records deposition. What was at issue then was the production of documents pursuant to Rule 2004(c).

The UST Motion, Second Vacate Motion and Protection Motion have now been settled by an agreement between LPS and the UST as further explained below. LPS and the UST have submitted a consent order that reflects their agreement that the Confidentiality Order be vacated and replaced with "Order Directing Filing of Documents Under Seal" ("Order Re: Protected Documents").

Still remaining to be addressed is the June 9 Order which contemplated that sanctions could be issued depending on the outcome of the investigation it commenced. Regrettably I have found certain practices and procedures employed by HSBC, its agents and attorneys to implicate the integrity of these proceedings as more specifically described below. I have also found that these same practices and procedures have created an environment where Rule 9011 duties have been subordinated to efficiency and cost-savings so as to require sanctions, and sanctions are appropriately imposed.

## BACKGROUND

### The June 9 Order

The June 9 Order emanated from a routine Claim Objection hearing held on June 5, 2008.[4] The hearing had previously been continued thirty days from its first listing to allow HSBC to produce documentation requested by Debtors in support of HSBC's disputed claim. At the continued hearing, David Fitzgibbon, Esquire ("Fitzgibbon") of the Udren

---

[4] The Claim Objection was settled on August 14, 2008, Doc. No. 71, but the court's inquiry into the process issues raised by the June 9 Order was only concluded with the evidentiary hearing on December 4, 2008.

Firm who represented HSBC,[5] advised me that HSBC was unresponsive to his notice that HSBC was directed to produce a loan history. When pressed as to the details of his colloquy with HSBC, he informed me that he had no personal access to his client HSBC but rather communicated solely by means of an electronic information system known as "NewTrak." NewTrak, I have since learned, is a technology developed by Fidelity and employed to provide foreclosure, bankruptcy and other mortgage loan-related default services to the mortgage industry. Simply stated HSBC and other mortgage lenders upload all or part of the mortgage documents and loan records of specified borrowers into the NewTrak system. Attorneys are engaged on a case by case basis through NewTrak to handle specified tasks. They get their assignments from NewTrak and report and/or seek further direction by "opening up an issue" on NewTrak. In this case, Fitzgibbon claimed to have opened up an issue (i.e., court has directed you to send a loan history immediately) and awaited an electronic response over NewTrak. He asserted that he had no recourse to the client when one was not forthcoming, specifically that he had no ability to discuss my directive about document production with either representatives of HSBC or the attorneys at Moss who had filed the claim for HSBC.[6]

---

[5] While Fitzgibbon appeared in connection with the Claim Objection, neither he nor any representative of the Udren Firm had prepared HSBC's proof of claim. That assignment was given to Moss Codilis LLP ("Moss"), a Colorado law firm which handles preparation and filing of bankruptcy proofs of claim nationally on behalf of HSBC. The Udren Firm had been retained to handle the filing of a motion for relief from stay ("Stay Motion") and the Claim Objection.

[6] Notably this hearing followed a hearing on the Stay Motion which had brought to light other deficiencies in the handling of HSBC's position. See p. 13, infra.

-4-

This frank but surprising admission resulted in the entry of the June 9 Order in which I ordered HSBC to "provide a full accounting to Debtors by transmitting a loan history in form that Debtors and their counsel can understand as well as an explanation about the flood insurance charges." Doc. No. 52.  I scheduled a continued hearing on the Claim Objection and directed the following persons to appear in addition to Debtors and their counsel: (1) a representative of HSBC with knowledge of Debtors' loan; (2) a representative of HSBC with knowledge of the procedures it uses with respect to assertion of claims in bankruptcy; (3) Maria Borrensen, Esquire ("Borrensen"), authorized agent for HSBC who filed the proof of claim and amended proof of claim in this case; (4) the partner in charge of HSBC's bankruptcy work at Moss; (5) the partner in charge of HSBC's bankruptcy work at the Udren Firm; (6) Lorraine Gazzara Doyle ("Doyle"), Esquire of the Udren Firm; and (7) Fitzgibbon.  As noted, the United States trustee was expressly invited to attend. The purpose of the hearing, as stated in the June 9 Order, was two-fold: (1) to address the Claim Objection and (2) "to investigate the practices in this case employed by HSBC, its attorneys and agents and consider whether sanctions should issue against HSBC, its attorneys and agents." Id.[7]

## HSBC and LPS

At the first evidentiary hearing held on July 23, 2008, Kimberly Graves ("Graves"), HSBC's Vice President in charge of bankruptcy, foreclosure and claims, testified generally

---

[7] HSBC, Moss and Borrensen filed a motion for reconsideration of the June 9 Order seeking to substitute filed affidavits in lieu of personal appearances. Doc No. 56. It was denied. Doc. No. 59.

as to HSBC's bankruptcy collection procedures which she stated would have been employed

with the Taylor loan.[8] Graves testified that HSBC utilizes a LPS case management system,

the mortgage service platform (the "MSP"), and that NewTrak is an offshoot of that system.

The MSP is used to manage loans from origination to satisfaction.[9] The MSP and NewTrak

"speak" to each other so anything done on NewTrak will write back to the MSP system.

Transcript ("Tr.") 7/23/08 at 68.   NewTrak manages, without human interaction, the

---

[8]  Graves oversees the bankruptcy department and supervises the manager who in turn
supervises five processors who monitor bankruptcy filings of HSBC's borrowers. It does not appear
that she had any direct involvement in the issues that gave rise to the June 9 Order.

[9]  I was not clear whether the MSP is just another LPS product but used for another
purpose, managing good loans, or a product provided to HSBC which it, not Fidelity, manages.
An examination of the LPS website clarified that the MSP is the mortgage banking industry's most
widely used servicing system with more than 50% of all mortgages in the United States serviced
on it.  It supports all mortgage servicing functional areas within one comprehensive system,
including comprehensive default functionality for collections work queue, foreclosure, bankruptcy
and REO management. http://www.lpsvcs.com. There is no mention of the NewTrak product on
the website, and I assume from the foregoing and the testimony that it is a subset of the MSP.
While only NewTrak, is the focus of this inquiry, the widespread use of the MSP for its touted
benefits of increased employee productivity and reduced servicing costs illustrates the extent to
which automation controls the management of mortgage loans. Id.

Indeed I was struck by how Graves and other users of the case management systems
refer to the technology as an active participant in managing the loans in bankruptcy, giving it
anthropomorphic qualities as though speaking of a member of their staff. For example, Graves was
asked what happens when it learns of a foreclosure and responded:

The foreclosure is put on hold.  We have a way to suspend the work station and
suspend all foreclosure coding, and a bankruptcy work station would be opened that
would code the loan so that no correspondence would go onto it.

When I asked whether she was referring to people, she replied:

No, we have a case management system that we use that has screens on it; we refer
to them as work stations.

Tr. at 51.

relationship between HSBC and its attorneys in the collection of delinquent mortgage loans through automated responses to certain queues. Through the MSP and NewTrak, HSBC has effectively outsourced the administration of its loan portfolio.

HSBC's relationship with LPS is governed by a 51-page contract, the Default Services Agreement (the "DSA"). Exhibit T-7. In the UST Motion, the UST contended that under the DSA, LPS is more than a conduit of data as it contends. Rather the "Services" that it is charged to perform for HSBC, the UST argued, resulted in its oversight and direction of the bankruptcy process. Supplemental Memorandum Further Supporting Rule 2004 Motion at 5. Services is a defined term under the DSA and refers to "default related administrative support services provided by LPS including, but not limited to foreclosure, bankruptcy, management and technology support services and products, all as specified in this Agreement and Exhibit A attached hereto." Exhibit T-7 at 10. Exhibit A was not made part of Exhibit T-7, and to the extent the specific services are listed there, I am unaware of what they are. Moreover, as this document was produced by LPS after Graves, the only HSBC witness, testified, there was no evidence as to how the DSA was implemented in this case. I do note that under the DSA, LPS is charged with managing the Fidelity Network firms and Vendors. Id. ¶2.9. A Fidelity Network firm includes a law firm that has executed a Fidelity Network Agreement. Id. In this case, the Udren Firm is a Fidelity Network firm. Exhibit T-2 (Network Agreement dated March 7, 2005 between Udren Firm and Fidelity).[10]

---

[10] Moss is presumably a Fidelity Network firm also although its agreement with Fidelity was not produced to the UST in this case.

## Moss Codilis and Proofs of Claim

According to Graves, when HSBC learns of a bankruptcy filing through notice from its foreclosure attorney, the mortgagor (or his counsel) or the court through the § 341 meeting notice, a referral is automatically made through "our case management system" to Moss, its exclusive claims agent, to file a proof of claim. Tr. 7/23/08 at 57.[11] Given the intended function of NewTrak as discussed below and the testimony of the Moss witness, it appears that the vehicle she was referring to as used to engage counsel was NewTrak.

The proof of claim process at Moss is overseen by Borrensen, whose title is Compliance Director,[12] and who is charged with compliance for the "whole company" in bankruptcy, demand letters and loss mitigation. In her words, "it's more of a macro perspective;" she makes sure that Moss "is compliant with all the state and district regulations and that internally that we have a quality control process that's working." Id. She made clear that Moss gets its referral through NewTrak after which a team of people verify the information in NewTrak, making sure that the social security numbers match the loan numbers after which the data is uploaded into Moss' system. Another set of clerks[13]

---

[11]  Moss has access to the MSP system as well as NewTrak which is employed solely to manage the relationship with attorneys on delinquent loans.  NewTrak is used by the Udren Firm who do not have access to the broader MSP system.

[12]  Borrensen reports to the chief executive officer, a non-lawyer, and described her role as analogous to a general counsel position. Tr. at 133.

[13]  Borrensen stated that these people were not legally trained, i.e., paralegals, but were experienced in this task from having worked for mortgage companies.

prepare the proof of claim from information acquired from NewTrak,[14] including a copy of the note, mortgage and any assignments.

If Moss needs anything else, Graves stated that it can request additional information by raising an issue on NewTrak, sending an intercom on NewTrak, communicating via the normal work e-mail system or picking up the phone and calling. While these are all theoretical possibilities, Graves acknowledged that the normal procedure is for counsel to open up an issue on NewTrak. Tr. at 65. The inquiry falls into a queue, i.e., a list of requests for a response, that is monitored daily by clerical people who are charged with directing a response back through NewTrak.[15] That then satisfies the open issue, and it is automatically closed.

Borrensen described the regular procedure Moss employs with proof of claim engagements as follows. There are ten people in the set-up team, ten people in the proof of claim process team and three quality control personnel. They are not paralegals but are provided training in these tasks. One of the processors retrieves the information from

---

[14] Noting that Moss has "high level access" to NewTrak, Graves stated that the Moss' employees can go to a screen that shows what delinquent payments are due, the payment amount that is due, and what late fees, escrow and corporate advances are due. When I asked where these figures came from, I was advised that they came from "the case management system." When I asked who was in charge of that system, she replied, "HSBC. It's a Fidelity product. I'm not sure what you're asking." Tr. at 59. When I pressed on to clarify that I was trying to determine who was inputting the data or where the screens came from, I was told that they were from the HSBC servicing system, i.e., a person in cashiering inputted the payments received and a person in accounting applied invoices but that late fees were assessed automatically by the system based on when the payment was recorded. Tr. at 58-60. Presumably this data put on the MSP was available on NewTrak since they "speak" to each other.

[15] LPS, which has been extremely cooperative during this inquiry, provided a detailed demonstration of how NewTrak works in a hypothetical case on October 23, 2008.

the MSP system, requesting any missing data from HSBC and then inputs it into the

proof of claim form for filing with the court. A quality control person reviews the claim

before filing. Borrensen, whose signature is electronically affixed to each proof of claim,

reviews a random sample of 10% of the claims filed. There is no review of the e-filer's

work so Borrensen would not know whether the proof of claim has been filed or not.

Tr. at 137-141. HSBC does not undertake to review the proof of claim either before it is

filed by Moss or after although it could do so as the proof of claim is uploaded into

NewTrak after it is filed. Tr. at 72.

With respect to the HSBC proof of claim in the Taylor case, Borrensen[16] signed it as

agent for for HSBC, but did not review it before it was filed. Tr. at 148. She acknowledged

that the incorrect note was attached and the incorrect payment amount was claimed.

She opined that the processor and if not, then the auditor who did the quality control,

should have caught the payment error. The wrong note attachment she attributed to an

e-filing error for which there is no review.

### Bankruptcy Proceedings and the Udren Firm

While Moss handles the filing of proofs of claim, HSBC utilizes local counsel to

handle matters that will involve court appearances. The Udren Firm, which as noted is a

Fidelity Network Firm, see p. 7 supra,[17] was engaged to handle the Stay Motion and the

---

[16] Borrensen clarified that she signed on behalf of Moss and not in her personal capacity. She authorizes the filing team to use her e-signature and password.

[17] According to the Network Agreement, HSBC is considered the mutual client of both LPS and the Udren Firm. Exhibit T-2, ¶ 7. LPS is also considered the agent of HSBC. Id. (continued...)

Claim Objection notwithstanding the fact that they had not prepared the proof of claim. The Udren Firm, according to its President and sole shareholder Mark Udren ("Mr. Udren"), specializes in foreclosures, bankruptcies and other legal services required by the more than fifty residential mortgage lenders in its client base. The firm employs ten attorneys and 130 paralegals, processors and administrative personnel, including employees in the referral department that monitor NewTrak for referrals.[18]

As noted, NewTrak is utilized by HSBC to retain counsel. A list of approved counsel for each state is contained in the NewTrak data base. HSBC processors routinely pull reports off the MSP system. When a report indicates the existence of a 60 day post-petition loan payment delinquency, the HSBC processor enters a code into the MSP system which triggers the NewTrak system to make the referral to local counsel to file a motion for relief. The MSP system has a matrix which is coded with location, type of matter, etc., and will automatically pick one of the previously approved attorneys and send the referral information to NewTrak which makes the referral over its system to the attorney as coded.[19]

---

(...continued)
Doyle's understanding of LPS's role was as agent to HSBC, its client. However, the DSA expressly negates this legal relationship, expressly stating that "[n]one of Fidelity, the Fidelity Network, Vendors or any of their respective employees shall be deemed to be agents or employees of HSBC or HSBC's Affiliates in any manner or for any purpose." Exhibit T-7 ¶ 2.9(c).

[18] Mr. Udren testified that he delegates the administrative work so his knowledge of NewTrak was limited. He did acknowledge that his firm does not maintain paper files any longer, relying solely on electronic data. Tr. 10/23/08 at 96. He also conceded that the firm could not practice at current fee levels without this aid which is relied upon "dramatically." Tr. at 91.

[19] There are three approved lawyers in this district. It is not clear how the computer picks from the list. Graves did not know why the computer picked the Udren Firm in this case. Clearly selection and retention as one of those pre-approved attorneys is important to a firm's economic well-being.

There is no human involvement in the designation or authorization of counsel for the task for which referral is made nor is there any authority granted to counsel other than to perform the task for which the referral is made.[20] The coding will also cause the MSP to upload the data, including the note, mortgage and assignment (if any) and any other necessary documents for the filing, into NewTrak to be retrieved by local counsel. NewTrak provides the attorney with the precise information it is coded to produce to perform the given task. It also gives specific time lines for performance of each action which may be monitored. Tr. 7/23/08 at 93. Notably HSBC does not review the pleadings before or after they are filed. Tr. at 82.[21] Local counsel do not have access to the MSP system and must request (again by NewTrak) any other data that it needs to perform its assignment. In the case of the Stay Motion which the Udren Firm was asked to file, the loan number, mortgagor's name, property address, post-petition payment amounts, and late fees would be made available from the MSP system to NewTrak. Because the Udren Firm was not asked to prepare the proof of claim, it did not get access to the Debtors' entire loan history.

Stay Motion. The first contested motion to come before me with respect to HSBC and the Taylors was the Stay Motion. Its history is a textbook example of why the

---

[20] Thus, an attorney representing a mortgage company is only authorized to act as local counsel for the matter referred. While Graves testified that she would use the same lawyer for other matters in the bankruptcy case, a separate NewTrak referral must authorize the representation. Tr. 7/23/08 at 92.

[21] The only exception to this practice occurs in New Jersey where the Local Rules of the Bankruptcy Court require the client to certify the truth and accuracy of the averments. Id. The wisdom of a similar rule in this district should be considered.

procedures used by HSBC and its counsel in the name of minimizing collection costs is so problematic. The Stay Motion, a nine-paragraph mostly boilerplate document identifying the movant and property and itemizing the alleged defaults, was filed on January 15, 2008. Exhibit U-4 (8/12/08); U-16 (12/17/08).[22] Doyle, the managing attorney for the bankruptcy department of the Udren Firm, described the preparation of the Stay Motion which was filed over her electronic signature. Referring to the information on the NewTrak screen, a legal assistant prepared the pleading. It was then given to her for review along with a copy of a screen which was printed out for her. Exhibit U-14.[23] The Stay Motion averred that the Debtor had failed to make payments 11/1/2007 through 1/15/2008 at $1,455.83 for a total of $4,367.49. Late charges of $174.69, post-petition attorneys' fees of $650.00 and filing fee of $150 were added and an unexplained suspense balance of $1,040.18 credited. Debtor's counsel Joye McDonald-Hamer ("Hamer") filed a late, and it appears inaccurate, answer in which she contended that Debtors had tendered the payments identified and they were returned by HSBC.[24] Exhibit U-9. Contemporaneously with the preparation of

---

[22] Identified by the court reporter as "Udren"-4, I shall refer to the Udren documents as "U" for simplicity.

[23] Fitzgibbon testified that the Stay Motion was first given to him for review against the NewTrak data and then to Doyle for further review as he had only been practicing one month at the time.

[24] While this had happened pre-petition, the payments were being accepted post-petition. I attribute this incorrect answer to Hamer as Debtors consistently testified that they were making current post-petition payments and they were subsequently proved to have done so as of this date. The problem, as discussed below, was a dispute over the payment amount.

the Stay Motion, Doyle also had Requests for Admission of the same facts pled in the Stay Motion prepared for her review and filing, presumably by a paralegal. Exhibit U-7. Using the Admissions, Doyle stated, her client would not have to make a court appearance to prove its case. No response was ever made to the Requests for Admissions. Exhibit U-17.[25]

Doyle, who signed the Stay Motion and Fitzgibbon who prosecuted it in Court, contend that the Stay Motion was accurate as filed. Debtors, not surprisingly would have had difficulty understanding the averments as pled since they had paid every month since filing the Chapter 13 petition on September 16, 2007, albeit late. According to HSBC, their monthly payment amount was $180 short as a result of an increase made in January 2007 to cover a premium for flood insurance Debtors denied needing. They kept paying the old amount. The Stay Motion showed the November payment due because part of it had been applied to the cure the October shortfall. Since there was an insufficient amount for a complete December payment, the balance on hand was carried as a suspense balance. None of this was apparent to Debtors or their counsel from the Stay Motion, and no one at the Udren Firm provided an explanation. The Stay Motion filed on January 15 also included the January payment which by the time of the continued hearing had been paid. Thus, at the time the Stay Motion was filed, the Debtors were short $360 for payments more than 60-days overdue, a fact not clear from the canned pleading prepared by a paralegal from NewTrak screens. The Debtors were charged $800 for the cost of the motion.

---

[25] Contrary to Fed.R.Bank.P. 7036 (incorporating Fed.R.Civ.P. 36(a)(3)), Hamer thought that her answer to the Stay Motion would satisfy the obligation to answer the Requests for Admissions.

After receiving the Answer, the Udren Firm agreed to continue the February 12, 2008

scheduled hearing to investigate. On March 19, 2008 Hamer filed an Amended Answer now

contending that the payments had been made and attaching copies of the front and back of

the checks for the October, November, December 2007 and January 2008 payments as well

as copies of the fronts of the February and March 2008 checks. Exhibit U-5. The continued

hearing was adjourned again for further investigation. Doyle's legal assistant asked for a

post-petition loan history on NewTrak and one was provided which did not confirm the

February and March payments. Moreover, the copies transmitted were missing the backs

of those checks, the reason being apparent on April 23 when Hamer forwarded the actual

checks for the February and March payments[26] to Jennifer Hiller ("Hiller"), a Udren Firm

employee in the sheriff's sales (versus bankruptcy) department. Based on that transmission

which showed Debtors then to be current, albeit still making the disputed monthly payment,

Hamer asked that the Stay Motion be withdrawn. The April 23 transmittal also included a

request from Hamer that "your client provide an accurate accounting of the payments

due and owing and made to date" as "with an accurate payoff, the Taylors are interested in

pursuing alternative options to bring this loan current." Exhibit U-19. For reasons not

explained, Hiller did not forward those payments to HSBC's Cashier's Department

for post-petition cure of the delinquency until the date of the hearing on May 1, 2009,

Exhibit U-20, and inexplicably she did not share this information with the bankruptcy

---

[26]  In short, the amended answer misstated the facts as the payments had not been made as
represented.

-15-

attorneys handling the Stay Motion.[27]   However, by the time of the May 1 hearing,
Fitzgibbon was aware of the payment cure.

Still not satisfied with the Debtors' proofs, Fitzgibbon appeared at the May 1
hearing to press the Stay Motion. He first argued that I should rule in HSBC's favor because
of the Debtors' deemed admissions of the facts pled in the Stay Motion, i.e., they owed
November, December, January payments plus costs in the total amount of $4,302.00.
On probing by the court, he acknowledged that as of the date of the continued hearing,
he had learned that Debtors had made every payment, albeit late and with a $180 shortfall
representing the cost of the flood insurance that was being challenged. I denied the Stay
Motion on the condition that Debtors stay current on the mortgage and escrow the flood
insurance premium, and directed the parties to address the flood insurance requirement.
Both committed to do so.

Claim Objection.  With the hope that the parties might resolve the insurance issue as
well as the pending Claim Objection in which Debtors challenged the arrears being claimed
by HSBC, I continued that contested matter until June 5, 2008. When the parties appeared,
I learned that little progress had been made. Hamer complained that she had requested
but had not received a loan history. In open court, Fitzgibbon replied that he had asked
HSBC but had not had a response to this request which he had made by opening up an

---

[27] Hiller was mistakenly perceived as an attorney by Hamer. Exhibit U-19. Why Hamer
would have sent the checks to her instead of the bankruptcy attorneys involved in the Stay Motion
is perplexing, and why the bankruptcy attorneys in the same firm would not have been advised
by Hiller that the checks came in is also a conundrum that was not explained. Both evidence the
rote and careless manner in which circumstances that are life altering to debtors are handled.

issue on NewTrak. When I asked why he could not pick up the phone and call his client, he advised me that all such inquiries had to be submitted through NewTrak. As noted above, those responses generated the June 9 Order and this series of hearings.

With respect to the requested loan history, Fitzgibbon is prepared to take responsibility for not understanding what was required and having requested the wrong information of HSBC.[28] Based on the Claim Objection, Hamer's comments at the May 1 hearing, Tr. 5/1/08 at 38-39 and her April 23 letter, Exhibit U-19, I assumed that Hamer was looking for a complete loan history, and I directed Fitzgibbon to have his client produce one prior to the adjourned Claim Objection hearing. Id. at 44-45.[29]

---

[28] His testimony attributed the request to his action when indeed all the communications on NewTrak were made by paraprofessionals. Exhibit T- 3. It does not appear that Fitzgibbon opened an issue at all but rather delegated the transmittal to one of the processors or paralegals in the Udren Firm office. Thus, whether the misunderstanding was his or was his paralegal's or a miscommunication between them is not clear.

[29] In a hindsight justification, Udren Firm argues that only a post-petition history could have been requested since the issue was insurance premiums and the Debtor acknowledged not making any prepetition payments starting when the payment was imposed. It concludes that flood insurance was the only claim objection issue in dispute and thus the only reason Hamer was seeking an accounting. Response of the Udren Law Firm to the Supplemental UST Brief (the "Udren Brief") at 12. Doc. No. 189. On the contrary, the Claim Objection, Doc. No. 31, averred that the imposition of the insurance charge affected the actual amount owed prepetition, and the only fair and equitable remedy was an accounting. The April 23 letter asked for an accurate accounting of the payments due and owing and made to date and stated that "with an accurate payoff, the Taylors are interested in pursing this option to bring this loan current." Exhibit U-10 and 19. On May 30, 2008 Hamer wrote again asking for an accurate accounting of the payments due and those made to date and an accurate accounting. Exhibit D-7. At the hearing on May 1, 2008, she repeated that request. Hamer believed that the insurance charge which was imposed prepetition had affected the loan balance, and if late charges had been imposed because of Debtors' failure to pay same, she would have been correct if those insurance charges were unwarranted.

Accordingly I take issue with the Udren Firm's unequivocal statement that there had never been a request for a full accounting and that I misinterpreted Fitzgibbon's response to my question "have you given her the accounting." He replied, "I have asked the account–asked for the
(continued...)

However, Fitzgibbon stated that only an issue for a post-petition loan history was opened. The UST who has reviewed the NewTrak screens, confirmed this explanation. Tr. 10/23/08 at 149. Assuming that the failure to produce a complete loan history was a result of a perfect storm of misunderstandings, the issue still becomes why Fitzgibbon believed that he could not contact a person at HSBC to secure one. The June 9 Order sought to find out.

HSBC claims that Fitzgibbon's conclusion that he had to limit his requests for information by opening issues on NewTrak was incorrect. Graves testified that its attorneys are not limited to the NewTrak vehicle to obtain information but that there is a procedure for "escalating" a request through use of other means of communication such as regular e-mail or telephone. There is no evidence that Fitzgibbon was ever advised that these options were available to him, and I credit his testimony that he understood his only option for communication to be through NewTrak. Whether his understanding was a failure in his training and supervision at the Udren Firm or a belief by the Udren Firm that direct communications would not reflect well on its handling of HSBC's files was not apparent. However, some insight into the manner in which the Udren Firm handles these referrals suggests both possibilities. The latter is reinforced by Graves' acknowledgment that deviation from the use of NewTrak is not the normal procedure. Tr. 7/23/08 at 65.

---

(...continued)

accounting. My client did not provide it to me yet." There has been no explanation as to why if a post-petition history was requested and a post-petition history obtained, Fitzgibbon told me that he had no response from HSBC to the request for an accounting. Tr. 6/5/08 at 5. While his attorneys attribute this to a stern judge and a young attorney's panic, I found Fitzgibbon to be forthright and more credible when answering my questions than when he responded to the prepared direct examination of his attorney. However, this is not about Fitzgibbon but the process by which information is sought and secured to discover the truth in contested matters.

HSBC's response to the June 9 Order confirms its ability to act quickly and in a meaningful way to requests for loan histories when the need to respond is made apparent outside of the NewTrak system. By the hearing scheduled in the June 9 Order on the continued Claim Objection and the process issues described above, HSBC's newly retained counsel had prepared an amended proof of claim based on a complete and understandable loan history which was contemporaneously produced. Exhibit D-1. With all the parties present in person, a short break in the court proceedings was effectively utilized to settle the Claim Objection, including the flood insurance premium dispute.[30] What could not be accomplished for six months through the use of electronic communication was finalized in an hour the old way, by people sitting down with all relevant information and talking to each other. This resolution paved the way for plan confirmation which was ordered on October 14, 2008. Doc. No. 110.[31]

### The UST Motion and Second Vacate Motion

As the proceedings were drawing to a close, the UST filed the UST Motion, identifying LPS/Fidelity as the object of scrutiny for its role as the agent through which HSBC acted. While I was focused on the conduct of HSBC's attorneys in fulfilling their duty as officers of the court and discharging their ethical obligations as attorneys given what

---

[30] Debtor had contended that her property was not in a flood zone. HSBC increased her mortgage payment because it secured forced placed insurance based on advice to the contrary. The matter was settled when HSBC acknowledged that the property was not in a flood zone although it was not disclosed to the Court how that verification was made. The mortgage was reduced to the prior amount and the accumulated arrears arising from the increase were compromised.

[31] Since that date HSBC had been granted relief from the stay and Hamer has been granted leave to withdraw with consent of Debtors. Doc. Nos. 138, 152.

appeared to be the absence of any direct contact with HSBC, the UST focused in the UST Motion on LPS.

Although addressing the facts of the Taylor matter, the UST made no secret of the role that the Philadelphia office was assigned by the U.S. Trustee, i.e., to lead a national team of UST offices in an investigation of LPS' conduct in bankruptcy cases. Mr. Baker, the Assistant UST, identified his office's role to use this case[32] as a vehicle for its scrutiny of LPS/Fidelity. The UST's effort to secure relief from the Confidentiality Order was in large part intended, by its counsel's own admission, to further the national effort. Fidelity objected to use of the now-confidential documents in other proceedings and argued that if I granted the Motion, it be subject to a protective order ensuring that the use would be limited to this case. While LPS and HSBC/Moss contended that the UST's sole objective was to further its national investigation of Fidelity, I note that the UST Motion was not exclusively so framed.

The UST contended that through the examination of the Fidelity documents, she had reason to believe that Fidelity, as agent of HSBC, was improperly directing legal action in this bankruptcy case.[33] The UST Motion averred that questions have arisen regarding the "conduct of [Fidelity] in participating in the preparation of the proof of claim of HSBC,

---

[32] There were at the time three cases pending nationally which could have been "litigation vehicles." It appears that this case was chosen because the Philadelphia court in which it was pending is proximate to the UST Region 3 office, not because of the specific facts of the case or issues presented. Tr. 9/2/08 at 12.

[33] After the UST Motion was filed, the parties agreed that the UST should conduct depositions of Udren Firm non-lawyers rather that protract the court hearings. If record testimony was determined to be needed, they would be called. None were.

accounting for payments of Debtors, imposition of fees and costs on Debtors, in preparing

the stay relief motion of HSBC, interference with communications between counsel and

clients, and all matters set forth in this Court's Order of June 9, 2008." UST Motion ¶ 3.

Doc. No. 77. Specifically, the UST noted that Moss filed two incorrect proofs of claim[34]

and Udren a Stay Motion and Claim Objection but Fidelity participated and facilitated

in a "yet to be completely ascertained degree." Supplemental Memorandum Further

Supporting Rule 2004 Motion by the Acting UST ("UST Memo") at 2. The UST argued

that while it has been reported to the Court that Fidelity's role is simply as a

facilitator of communications and information library, it is clear that Fidelity's role is

"much greater." Id.

    In his cross examination of Doyle, the UST's counsel George Conway ("Conway")

sought to elicit the role of the Udren Firm *vis a vis* HSBC and LPS/Fidelity. Doyle testified

that she believed that Fidelity was an agent of HSBC[35] and that she relied on the NewTrak

system for all factual information about the loan. Until the June 9 Order, she had no direct

contact with HSBC although she stated her belief that she "could call them and they

would talk to her." Tr. 12/17/08 at 79. However, she acknowledged that the Udren Firm

processors (including paralegals) were instructed to communicate by NewTrak and could

---

[34] The wrong note and mortgage were attached and the wrong monthly payment was memorialized. Ironically, the proof of claim showed the payment exclusive of the insurance premium that the Udren Firm pressed in the Stay Motion. This is further evidence of how processors and paralegals working from screens in a mechanical manner are unlikely to ensure a quality result.

[35] The UST showed her the DSA and Network Agreement that were inconsistent on this point but she testified she was unfamiliar with either. Supra n.14.

only deviate from this practice by using Udren Firm "escalation procedures," i.e., making a request of an assistant manager and then manager. Tr. at 79-81. Neither Doyle nor anyone that she supervised was requested to check the accuracy of any of the NewTrak data. While she did not know who loaded the information on the system, assuming that Fidelity got it from HSBC, she stated she had no reason to disbelieve it.

Using the documents that had been produced by LPS under the Confidentiality Order, Conway asked for Doyle's understanding of the various screens that constitute the Taylor record. Exhibit T-3. She testified that she never looked at the NewTrak entries in the Taylor case[36] and was uninformed about the shorthand references posted there. Indeed an examination of the screens does not evidence one entry from either Doyle, Fitzgibbon or Borrensen, the only attorneys involved in the Taylor bankruptcy. Rather the postings were mainly between Erin Gavin of the Udren Firm and Christine Myhr of LPS or Carrie Roundabout of HSBC. Id. In short, it appears that Doyle, the manager of the Udren Firm bankruptcy department, had no relationship with the client, HSBC.

The UST had argued that the Court's inquiry as framed by the June 9 Order was not satisfied by the testimony without the use of the restricted documents. The UST averred that these documents, which Fidelity agreed may be part of the record as admitted, proved that Fidelity is not a mere conduit as it claimed but has managed, overseen and directed the workout process. In support of this contention, the UST pointed to the

---

[36] Referring to her statement that she had verified her paralegal's preparation of the Stay Motion with the NewTrak screen, the verification must have been from another screen.

Default Services Agreement between Fidelity and HSBC, Exhibit T-7 and the Network

Agreement between Fidelity and the Udren Firm, Exhibit T-2. Quoting extensively from

these documents, the UST argued that these agreements give certain powers and authority

to Fidelity which merit further scrutiny. UST Supplemental Brief at 5-9. Referring then

to the same "process management notes" which Conway had questioned Doyle about,

Exhibit T-3, the UST argues that they show how NewTrak was employed in this case to

transmit information and advice from the Udren Firm to Fidelity (versus HSBC) and to

provide direction by Fidelity (not HSBC) to the Udren Firm.

As noted while the UST Motion was under advisement, the UST renewed her

demand to be released from the Confidentiality Order, apparently abandoning her

previous conclusion that the UST Motion would provide a complete remedy by

deciding whether she could have unrestricted use of the Fidelity documents that had been

voluntarily produced. The Second Vacate Motion raised a new concern, focusing on the

bankruptcy conduct of Moss. Seeking emergency relief, the UST claimed that the

Confidentiality Order prevented the Office of the UST from performing its mandated

functions and duties throughout Region 3 because the Acting UST and her counsel,

who had seen the confidential documents, "cannot purge their minds of knowledge and

information relating to Moss Codilis derived directly or gleaned from the discovery subject

of the Court's Order of October 21, 2008." Second Vacate Motion at ¶ 7.[37]

---

[37] Specifically the UST contended that she could not: (1) communicate with her superiors
concerning her actions; (2) obtain advice from general counsel; (3) report a basis and justification
in continuing or discontinuing her investigation and participation in these cases [i.e., cases with
(continued...)

At a hearing on the Second Vacate Motion on March 11, Baker testified as to the burdens the local Office of the UST was experiencing as a result of his perception of the restrictions of the Confidentiality Order. In colloquy with LPS' counsel, it quickly became apparent to me that the UST was taking an overly cautious view of the restrictions imposed by the Confidentiality Order, and while commendable, the restraint was self-imposed. Having verified that Fidelity had no objection to the use of the produced documents in this case, and being far along in my consideration of the UST Motion, I advised the parties that I was prepared to modify the Confidentiality Order to the extent its language could restrict discussion of what the UST learned during these proceedings (versus dissemination of the disclosed documents). The parties requested and were allowed to privately confer and subsequently reported a settlement of the pending contested matters.

The resolution recognizes that the UST has not completed her investigation of Moss. Indeed the UST's discovery of the Moss/Fidelity documents was abandoned without prejudice based on my view that the national conduct of Moss in filing proofs of claim for HSBC went beyond the defined scope of the June 9 Order. In a private agreement which is summarized in the Order Re: Protected Documents entered contemporaneously with this Order and Opinion, LPS and the UST agree that the UST may retain the Fidelity documents until June 30, 2009 pending the completion of her review of Moss's conduct in this case.

---

(...continued)
Moss proofs of claim]; (4) share information with Congress; (5) analyze and attend to objections to proofs of claim where her thought process would be affected by knowledge obtained or gleaned from the protected discovery; (6) coordinate her activities with other offices and effect a common program understanding and policies on similar issues; (7) comply with the Freedom of Information Act. Id. ¶ 8.

Should the UST choose to take any formal action against Moss that requires the use of these documents, an appropriate motion shall be made to seal the documents from public view. On this basis, the Confidentiality Order is now vacated.

With the UST Motion, the Second Vacate Motion and Protection Motion having been resolved by the Order Re: Protected Documents, the only issues before the Court are those I raised in the June 9 Order. I turn to them now.

## DISCUSSION

### I. Subject Matter Jurisdiction

When the recently settled motions were pending, LPS had claimed that I did not have subject matter jurisdiction to grant the UST's Motion. If Fidelity were correct, my authority to impose sanctions would be circumscribed without regard to the merits of the investigation by the Court and the UST. Even without LPS' contention, it behooves the Court to examine its own jurisdiction before further addressing the matters that were the subject of the Court's June 9 Order. See generally, Nesbit v. Gears Unlimited, Inc., 347 F.3d 72, 76 -77 (3d Cir. 2003) (federal courts have an independent obligation to satisfy themselves that they have subject matter jurisdiction and may raise the issue *sua sponte*). If the Court has no jurisdiction to grant the UST Motion, it follows that it had no jurisdiction to conduct hearings and enter an order now on the matters I raised *sua sponte* and as to which I invited the UST to participate. Accordingly, I turn first to the threshold issue of subject matter jurisdiction.

A bankruptcy court's subject matter jurisdiction is prescribed by 28 U.S.C. § 1334

which limits bankruptcy jurisdiction to civil proceedings "arising under title 11, or arising

in or related to cases under title 11."[38]  Quoting a line of Third Circuit decisions,[39] LPS

contended that the UST Motion has no jurisdictional foundation as a "related proceeding"

because given the status of the Chapter 13 case, the examination cannot produce any

information that will have a "conceivable effect" on the estate.  It bases its position on the

fact that the Stay Motion has been resolved, the Claim Objection settled and the Chapter 13

plan confirmed so as to revest the estate in the Debtors.  In further support of its claim,

LPS points to cases that recognize that jurisdiction narrows post-confirmation and generally

is limited to matters affecting the implementation or execution of the Debtor's plan.

See Fidelity Objection to UST's Vacate Motion and Supplemental Objection to UST

Motion, at 10.  Doc. No. 133.

In solely focusing on the UST Motion, LPS lost sight of my June 9 Order which

commenced and frames the inquiry that is the proceeding before the Court.  In the course

of a contested matter, I issued the June 9 Order against HSBC (a creditor in this pending

Chapter 13 case), its attorneys and agents to appear and address what I perceived during

court proceedings related to the Claim Objection and the Stay Motion that preceded it,

---

[38]  While conferred on the district court, the jurisdictional grant has been delegated to the
bankruptcy court under 28 U.S.C. § 157.

[39]  The oft-quoted test of related jurisdiction framed by the appellate court in In re Marcus
Hook Dev. Park, Inc., 943 F.2d 261, 264 (3d Cir. 1991), states that a proceeding is related to a
bankruptcy case so long as it is possible that a proceeding may impact on the debtor's rights,
liabilities, options, or freedom of action or the handling and administration of the estate.

to implicate the good faith prosecution of these contested matters and compliance with

Rule 9011 obligations regarding the assertion of claims.   These inquiries were not

merely related to the bankruptcy case but core proceedings involving the administration

of the estate, allowance of claims against the estate, motions to terminate the stay and

other proceedings affecting the adjustment of the debtor-creditor relationship.   28 U.S.C.

§ 157(2)(A), (B), (G), (O ).   Because I viewed the matters I raised to be fundamental to the

integrity of the bankruptcy process in this case, I made clear in the June 9 Order that

settlement of the Claim Objection would not moot the inquiry.   Any other outcome would

allow parties to insulate themselves from court scrutiny of potentially sanctionable

conduct by offering a quick settlement.

Jurisdiction is determined at the commencement of the action.  Smith v. Commercial

Banking Corp. (In re Smith), 866 F.2d 576, 580 (3d Cir. 1989); Linkway Investment Co. v.

Olsen (In re Casamont Investors, Ltd.), 196 B.R. 517, 521 (9th Cir. BAP 1996).  There was

no contention that this Court lacked subject matter when this inquiry began.  While there

may be a question of whether it should be retained upon dismissal of a case, that is not

the circumstance presented here.[40]  The Chapter 13 case is still being administered by the

Chapter 13 trustee.  Nor does the confirmation of Debtors' Chapter 13 plan deprive this

Court of jurisdiction.  As the Third Circuit made clear in Donaldson v. Bernstein, 104 F.3d

547, 553 (3d Cir. 1996), post-confirmation jurisdiction is appropriate where the dispute is

not collateral to the bankruptcy case, and especially when the integrity of the bankruptcy

---

[40] Moreover, even when the case is dismissed, the court has discretion to retain jurisdiction
in appropriate circumstances.  Smith, 866 F.2d at 580.

process is implicated.  See also Boston Regional Medical Center, Inc. v. Reynolds (In re
Boston Regional Medical Center, Inc.), 410 F.3d 100, 106 (1st Cir. 2005) (while narrowing
interpretation of "related to" jurisdiction may be applicable to Chapter 11 reorganized
debtors that have reentered the market place, it does not follow that courts should abandon
the general rule of broad "related to" jurisdiction in all post-confirmation cases).

Finally, and most significantly, the June 9 Order stated that the purpose of the
hearing being scheduled was "to investigate the practices employed in this case by HSBC
and its attorneys and agents and consider whether sanctions should issue against HSBC,
its attorneys and agents."[41] (emphasis added).  HSBC's attorneys and agents have been
identified as the Udren Firm, Moss and Fidelity.[42]  In In re Wilson, 2009 WL 304672
(Bank E.D. La. Feb. 6, 2009), another squirmish between the UST and Fidelity, the Court
found no jurisdictional defect.  Like here, the court initiated inquiries into the conduct of
Fidelity, the mortgage lender and its counsel in connection with the handling of motions
for relief. Because of conflicting testimony, the court granted the UST's request to conduct
additional discovery.  Movants sought to quash the UST's discovery requests arguing
that as the motions for relief were no longer pending, no case or controversy existed and the
court had no jurisdiction to allow discovery. The court disagreed observing that although
the relief requested was denied, "it maintained jurisdiction to consider collateral matters

---

[41]    While not labeled as an Order to Show Cause, the July 9 Order and the possible
consequence from the hearings, i.e., sanctions, implicitly initiated such a procedure.

[42]    LPS' characterization of itself as a stranger to this bankruptcy case is unsupported by
the evidence.  There is a very live case or controversy concerning the conduct of Fidelity in this
bankruptcy case.

that emanate from the Motions as well as the administration of the case." Id. at *3.[43]

Moreover, the court's interest in protecting the integrity of the judicial system against

improper conduct supports jurisdiction, the court there, as here, noting that it had expressly

reserved the right to award further sanctions. "To hold otherwise would encourage a party

expecting sanctions to simply ignore an order to show cause...." Id.

While I recognize that LPS did not contend that the Court had no authority to

conduct the inquiry commenced by the June 9 Order, if there would be no jurisdiction for

the Court to consider the UST Motion, would it not follow that there would be no

jurisdiction to support any possible sanctions order? Yet the consensus of the courts to have

undertaken inquiries concerning the conduct of mortgage lenders, their attorneys and agents

participating in the Chapter 13 process, either expressly recognized their jurisdiction where

challenged or proceeded to render decisions presumably sure of their authority. E.g., In re

Countrywide Home Loans, Inc., 384 B.R. 373 (Bankr. W.D. Pa. 2008); In re Parsley, 384

B.R. 138 (Bankr. S.D. Tex. 2008). I do so as well.

## II. Findings and Conclusions Re: June 9 Order

Based on the testimony of the witnesses that appeared and the documents that

have been made part of the record, I stated my findings in some detail above. When this

matter began, I was unaware of NewTrak and how it was routinely utilized in bankruptcy

---

[43] It cited Cooter & Gell v. Harman Corp., 496 U.S. 384, 385 (1990) which held that "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending." That case illustrated that the dismissal of a matter did not deprive the court of its ability to award attorneys' fees and other sanctions under Fed.R.Civ. P. 11 which is substantively identical to Fed.R.Bankr.P. 9011.

cases. By this Opinion, I have sought to share my education with participants in the bankruptcy system who may be similarly unfamiliar with the extent that a third party intermediary drives the Chapter 13 process. I also fulfill the object of the June 9 Order to determine whether sanctions should issue regarding the conduct of HSBC, the Udren Firm, Moss and Fidelity in the Taylor matter.

Introduction. In its zeal to administer defaulted mortgage loans in bankruptcy economically, HSBC has implemented LPS' NewTrak system which transfers to the New Trak system the management of its defaulted loans in bankruptcy. NewTrak interposes a LPS processor as intermediary between HSBC and the law firm that the system engages from a list pre-approved by HSBC. With the HSBC data uploaded to a LPS system, LPS responds to the perceived needs of retained counsel to perform the assigned task, at times addressing HSBC electronically for further information. The retained counsel does not address the client directly nor does it address another counsel that may be performing tasks for HSBC in the same case, even when the separate attorneys are handling related matters. E.g., Moss filed the proof of claim and the Udren Firm responded to the Claim Objection. Rather both counsel discharge their assignment without communicating with anyone other than NewTrak which has provided them with the data to spread into their proofs of claim and motions. Counsel is expected to prosecute a motion for relief and an objection to a proof of claim with solely the information that some pre-coded program believes is necessary to prepare the pleading. If counsel has a question or needs further data, HSBC expects that its attorneys or more accurately, their processors will make the request

by "opening up an issue" on NewTrak.   When NewTrak responds, the matter is closed.

The entire process occurs without any communication between counsel and the client and

for the most part, without any legal judgment by an attorney.   Rather the data is secured

from the NewTrak system by a paralegal who prepares the pleading which is "reviewed" and

electronically signed by the attorney.   As noted below, while purporting to review the

pleading, the data on which the review is made is controlled by NewTrak.

This mechanical process is employed by HSBC and presumably other mortgage

lenders who subscribe to the NewTrak system for routinely filing motions for relief with

the goal of moving toward foreclosure against debtors whose loans show up in the system

as sixty days post-petition due.   When the pre-programmed time is reached, a code sets the

process in motion.   Local counsel are hired and their marching orders are clear.   They are

to file a motion for relief without any consultation with the client.   In so doing, the attorney

abandons any pretense of independent judgment to the greater goal of expeditious and

economical client service.   However, while the lawyer must be mindful of his client's

business needs to obtain the expected service and his firm's needs to generate repeat

business, she may not do so without regard to her professional responsibilities.   "Lawyers

must not allow the interests or dictates of a client to control their professional judgment."

In re Martinez, 393 B.R. 27, 36 (Bankr. D. Nev. 2008) (lawyers sacrificed professional

independence to the demands of a large institutional mortgage lender client).[44]

---

[44] One bankruptcy judge has described this approach, marked by its absence of independent
investigation, as "'butler-style,' under which the sequaciously servile lawyer does whatever the client
wants and then cites that client's command as a shield to improper actions." In re Aston-Nevada
(continued...)

It is a regrettable reality, especially in this economic climate, that many homeowners are defaulting on their mortgages. While bankruptcy affords an opportunity to save the family home through a Chapter 13 plan that stretches out the payment of mortgage arrears, it also requires debtors to maintain current payment on their mortgages. 11 U.S.C. § 1322(b)(5). This obligation is beyond the capability of many debtors who utilize a bankruptcy to forestall the inevitable. It seems reasonable that a mortgage lender should be able to avail itself of economic and expeditious means of collecting defaulted loans through the use of technology and delegation of tasks to lower cost labor. In many cases, the motions are granted by default, the debtors, or often more accurately their attorneys, filing no answer or making no appearance, where there is simply no defense to the relief sought. However, where, as here, the debtor contests the relief sought, the flaws in this automated process becomes apparent. At this juncture, an attorney must cease processing files and act like a lawyer. That means she must become personally engaged, conferring with the client directly and abandoning her reliance on computer screens as expressions of her client's will. This did not happen in this case until the Court became involved. It should not have taken judicial intervention to bring the Claim Objection to its conclusion.

Nor am I persuaded that HSBC's "escalation procedure" whereby their counsel can contact them directly, is intended to prevent repetition of the difficulties experienced in

---

(...continued)
Limited Partnership, 391 B.R. 84, 103 (Bankr. D. Nev. 2006). While I in no way suggest that the conduct of the Udren Firm or Moss equates to the outrageous behavior of sanctioned counsel in the Aston-Nevada case, the principle espoused by the court nonetheless applies.

this case. The procedure is at best discouraged and in this case, not communicated to the attorney who was handling the matter and appearing in court. For the Udren Firm to contend that communication with HSBC was available flies in the face of the testimony of its employees. Fitzgibbon, who was handling the case in court, believed he was precluded from making any direct contact with the client. Doyle described an internally mandated "escalation" system of Udren's own making that effectively acted as an impediment to communication with the client. In In re Parsley, 384 B.R. 138 (Bankr. S. Tex. 2008), the Court was likewise unimpressed with local counsel's representation that while the preferred method of communication is with national counsel, there was no prohibition on direct contact to the client. While viewing this as an improvement over a previous outright ban on communication with the client, the court remained concerned "that local counsel will still be hesitant to directly contact the client out of fear that [national counsel] will stop sending files to that local counsel." Id. at 156. Indeed the Udren Firm acknowledges as much when it states that it "is one of many law firms that conduct a high volume foreclosure bankruptcy practice and if a lender requires that a law firm enter into an agreement with its agent, a servicing company such as Fidelity, Udren has no choice but to participate in such a program if it wants to do business." Udren Brief at 6. Although Graves testified that HSBC's escalation procedure leaves open the door to direct contact, it is admittedly not a normal practice. In the competitive world of legal representation, HSBC's position chills ready direct access to the client as the Udren Firm understood when it put into effect its

own escalation procedure which prohibits the person handling the case from contacting the client without management authority.[45]

Moreover NewTrak appeared for all practical purposes to be the sole avenue for the Udren Firm to address issues relating to the defense of the Claim Objection. The proof of claim was filed by Moss who HSBC has assigned to perform this function in all of HSBC's bankruptcy cases. Its only relationship with the local law firm defending objections to the claims it has filed is a NewTrak entry passed to and from Fidelity. HSBC expects its local law firms to communicate by opening an issue on NewTrak and neither authorized nor expected direct contact between the Udren Firm and Moss. Tr. 7/23/08 at 107. Fitzgibbon partially explained to me his difficulty in providing requested information by noting that since the Udren Firm did not prepare the proof of claim, it did not have access to the client loan history. Tr. 6/5/08 at 8. While neither Hamer nor the Udren Firm discovered the errors in the Moss-prepared proof of claim, presumably had one firm both prepared and defended the proof of claim or had both firms communicated about the contested claim before Doyle filed her unequivocal defense of it, those errors would have been corrected.

I have already described in some detail the court proceedings that I administered in this case. While the Udren Firm would like me to attribute the problems to incompetency

---

[45] The Network Agreement between the Udren Firm and LPS imposes the condition for direct contact. It states that "[t]he Firm will never be prohibited from directly contacting any client where, in the professional opinion of the Firm such contact is necessary." Exhibit T-2, ¶ 7 (emphasis added). Presumably the Udren Firm escalation procedure requires a professional opinion to be rendered before contact is permitted. Doyle was unfamiliar with the Network Agreement but knew of the escalation procedure.

-34-

on the part of Debtor's counsel and the inexperience of their young lawyer, I reject that

oversimplistic answer.   While it is certainly true that Debtor's counsel lacked basic

proficiencies to handle the contested matters[46] and Fitzgibbon had only been a member of

the bar for a short time, the problems that were encountered were systemic and cannot be

laid at their feet. Regrettably the Udren Firm has refused to acknowledge the inadequacy

of their representation, and HSBC appears blind to the deficiencies of the process it

has imposed on its attorneys.   LPS has a successful commercial product but walks a

fine line between servicing activities and directing the Udren Firm in the practice of law.

Accordingly, I will outline what I perceive to have been the specific flaws of this system

and the approach in this case.

Stay Motion.  The Stay Motion was prepared by a paralegal and signed by Doyle

using the NewTrak procedure.  It was fundamentally a misleading pleading.  While it

showed Debtors to have failed to make regular mortgage payments of $1,455.83 for the

months of November through January, they had indeed made regular monthly mortgage

payments for November and December, but in the amount of $1,237.00 as a result of their

objection to the extra charge for flood insurance.  While a line item on the motion showed a

---

[46] Debtors have filed an Objection to Hamer's Application for Compensation complaining,
inter alia, that she did not provide competent representation.  As noted in the Order granting the
Objection, Hamer's omissions, tardiness and lack of clarity contributed to the problems in this case.
A more skilled lawyer might have headed off some of the problems caused by the NewTrak approach
to mortgage claim prosecution. However, the process employed by a mortgagee and its counsel must
be fair and transparent without regard to the quality of debtor's counsel since many debtors are
unrepresented and cannot rely on counsel to protect them from legal action taken by mortgage
holders.

"suspense balance," there was no explanation of the significance of that entry. Moreover by the time the motion was heard, the January payment had been made, although $180 less than HSBC claimed was due. Thus, the Debtors were making post-petition payments, albeit untimely ones, and had challenged the propriety of the extra charge. Nonetheless the Udren Firm filed the form pleading with the numbers plugged in as the paralegal pulled them off NewTrak consistent with HSBC's automated application of funds. For at best a $540 dispute, the Udren Firm mechanically prosecuted a motion averring a $4,367.49 post-petition obligation, the aim of which was to allow HSBC to foreclose on Debtors' house (and charge them $800 for so doing without regard to the actual costs that were incurred).[47] Yet because the data was consistent with the data the paralegal drew from NewTrak, Doyle contended that she had reviewed the Stay Motion before filing it and insisted that it was a good motion.[48]

Not even when Debtor filed an answer to the Relief Motion did the Udren Firm try to get to the bottom of the problem, merely posting to NewTrak and continuing the hearing several times to allow the Debtors to prove up their defense. This Doyle explained as a benevolent accommodation to Debtors but more likely reflects the reality that

---

[47] Not developed on this record were the costs associated with the various undertakings by the Udren Firm and who is to pay them if not collected from the Debtors, HSBC or LPS, and how and by whom LPS is paid.

[48] However, she did not defend her pled averment in the Stay Motion that the Debtors lacked equity in their property, rather explaining that it is part of the form pleading. She acknowledged having no knowledge of the value of the property and having made no inquiry on this subject.

the institutional consumer mortgagee rarely if ever has a witness to carry its burden of

proof when the debtor contests the motion as did the Debtors here.   Since the sole

communications were via NewTrak, there was never a discussion between the client

HSBC and its attorneys at the Udren Firm as to the propriety of pressing the Stay Motion

given the nature of the defaults which were far less than 60-day post petition due which is

the policy acknowledged by HSBC as a predicate for seeking stay relief.[49] Rather the Udren

Firm went forward with a hearing on a motion that did not properly set forth the disputed

issue and relied on the unanswered admissions knowing that they did not accurately state

the facts.[50]

　　　This formulaic approach to pursuing relief upon behalf of a mortgage lender client

has been criticized.  In In re Allen, 2007 WL 115182 (Bankr. S.D. Tex. Jan. 9, 2007),

the Court described a computer system maintained by mortgagee counsel where the entry

of certain codes would generate legal pleadings.  Someone at the law firm entered the

wrong data and the errors were not corrected when the attorney claimed she reviewed

the file.  The Court concluded that the attorneys did not read the computer-generated

---

[49] The Udren Firm's authority from HSBC allowed them to take only three actions: (1) seek a continuance; (2) settle the Motion with an agreement for a six month maximum cure of the mortgage arrears with an agreement for stay relief upon certification of default of any future payment; and failing either of the foregoing; (3) press the motion.   Tr. 7/23/08 at 89. No consultation with HSBC was expected nor occurred during the pendency of the contested matter.

[50] Certainly had Hamer answered the Admissions instead of erroneously believing that her Answer to the Stay Motion was sufficient, Fitzgibbon would not have been able to rely on them. However, her mistake did not justify Fitzgibbon's use of the Admissions as evidence to seek relief from stay when he knew that they were not true. In re Wilson, 2009 WL 304672, at *2 (Bankr. E.D. La. Feb. 9, 2009).

pleadings that were filed with the court or their efforts were so superficial to be meaningless.

Id. at *4-5.  In support of Rule 9011 sanctions that it imposed, it reasoned that:

> Barrett Burke is not adequately investigating the facts that it alleges before it
> files pleadings.  Barrett Burke has also become over reliant on the computer
> system that generates its pleadings, and its attorneys are allowing their
> signatures to become affixed to pleadings that they have not adequately
> reviewed....

> Barrett Burke has not fulfilled the requirements of Rule 9011 by performing
> adequate inquiry prior to filing the pleadings and by assuring that the
> pleadings that it filed were warranted in fact and in law.

Id. at *6.

In In re Parsley, 384 B.R. 138, 183 (Bankr. S.D. Tex. 2008), the Court conducted a

sua sponte review of the actions of a mortgagee (in that case Countrywide) and his counsel

in a Chapter 13 case.  Judge Bohm's remarks are equally applicable here.  Noting that what

was in theory to be a cost savings to the consumer, the flat fee arrangement between the

mortgage lender and counsel " had fostered a corrosive 'assembly line' culture of practicing

law."  Id. at 183.  He went on to describe what he observed:

> As the case at bar shows, attorneys and legal assistants at Barrett Burke and
> McCalla Raymer are filing motions to lift stay without questioning the
> accuracy of the debt figures and other allegations in these pleadings and
> appearing in court without properly preparing for the hearings. These lawyers
> appear in court with little or no knowledge because they have been poorly
> trained.

Id.

I denied the Stay Motion when I learned that the dispute was over the correct

amount to be paid not the Debtors' failure to pay.  The real nature of the dispute was not

-38-

apparent from the pleading. A more able attorney than Hamer might have been able to file

an Answer that set forth the parties' true difference rather than merely aver that the Debtors

were current. However, the Stay Motion did not accurately state the post-petition default,

and it was not until the hearing that I understood the nature of the dispute. It should not

be "the Court's responsibility to ferret out the truth." In re Nosek, 386 B.R. 374, 382

(Bankr. D. Mass. 2008) (creditor's responsibility to plead who owns the note and mortgage

and who is the servicer). As stated by the Court in In re Schuessler, 386 B.R. 458 (Bankr.

S.D.N.Y. April 10, 2008):

> Many times, for a variety of reasons, the lift-stay motions are not opposed.
> Accordingly, the Court relies upon the accuracy of the statements made by a
> creditor requesting relief from stay. When a secured creditor requests relief
> from the automatic stay, the Court must be able to trust that the motion is
> based upon a realistic and conscious assessment by the creditor, before the
> motion is filed, that the creditor really does lack adequate protection under the
> facts in that particular case.

Id. at 478-79 (finding that what Chase chose to include and omit from the motion created

an extremely misleading view of the facts).

My denial of the Stay Motion was also supported by the fact that the proof of claim

filed by Moss on behalf of HSBC showed the amount of the monthly payment as the amount

claimed by Debtors, i.e., $1,237.00, the amount without the insurance premium. Since the

Udren Firm and Moss  did not communicate nor apparently review each other's filings

on behalf of HSBC, the Udren Firm was unaware of the disparity. Based on this record,

I questioned the good faith of HSBC and the Udren Firm in pressing the Stay Motion.

I advised Fitzgibbon that I would take no further action so long as he and his firm took my

comments as a warning that such conduct should not be repeated. I did state that I expected

him to contact his client and work with Hamer to resolve the flood insurance issue.

While the Udren Firm contends that every effort was being made to get the Debtor

to address her responsibility to take steps to have her property removed from the flood zone

designation so HSBC could cease charging for forced placed insurance, a review of the

NewTrak screens shows an avalanche of confusing and unproductive entries as the issue

bounced from one processor to another.[51]  On April 28, 2008, Hamer was advised by a

Udren Firm paralegal's e-mail that she needed to produce a certain FEMA certification to

---

[51] The Udren Firm refers to a chronology (the "Summary") prepared by Graves that outlines HSBC's efforts to deal with the insurance premium dispute. Exhibit U-12. The source of this information was not authenticated nor were any of the underlying documents produced. Based on the record, I understand that HSBC's insurance department, not the bankruptcy department, was handling this issue. It appears that HSBC paid for forced placed insurance in the absence of confirmation that Debtors had secured same. In response to the Debtors' claim that the flood plain designation was incorrect, they were sent an "I disagree" package by the Escrow Insurance Department on March 26, 2008 instructing them on how to get the flood map corrected. Debtors claimed they never received it. No copy was sent to their counsel. Exhibit M-2 (5/1/08 hearing). The Insurance Department sent the paperwork to the Bankruptcy Department on March 26, 2008. Exhibit U-12. According to the Summary, Hamer called and spoke to someone on April 3 and was advised that a letter of map amendment was required to remove the property from the flood zone. On April 7, 2008, there is a cryptic entry that the "task was closed due to the fact request was already submitted a week ago" and the task was set up for another recheck." The chronology ends there in the hand prepared Summary. Since the Udren Firm opened this issue to the Court with reference to Exhibit U-12, I have examined the NewTrak screens for the period after the task was closed to see whether the contemplated recheck was performed. Exhibit 5 to UST Brief. In the period from March 14 (when the insurance issue comes into the radar of the HSBC Bankruptcy Department on NewTrak) to May 27, 2008, there were approximately 19 entries. On March 21, a Fidelity processor closed the issue with the notation that the Debtors should contact the Insurance Department. On April 17, there was a notation by an HSBC employee that the Debtors need to correct the problem. The Debtors' position that the property was not in the flood zone was notated again by a Udren employee on May 1, the day of the hearing.

resolve the Claim Objection and that HSBC could take no corrective action until she did so.

She replied that she had forwarded the requisite document (with her April 23 transmission).

She was then advised that it was the incorrect document. Exhibit U-11. Notwithstanding

Hamer's ongoing efforts to resolve this issue for the client so that they could rightfully pay

the mortgage without the addition of the insurance premium, the Udren Firm moved forward

two days later with its form Stay Motion. Nor was there any consultation with HSBC as to

whether in light of its communications with Debtors' counsel over the proper procedure to

verify the flood insurance exemption, the Motion should be withdrawn (since the factual

averments were inaccurate) or at least further adjourned.

   The Udren Firm attempts to take shelter in Fitzgibbon's inexperience. I agree that

some leeway should be given in evaluating his conduct. However, the Udren Firm cannot

on the one hand delegate court appearances to an attorney and then seek to justify its

performance by his limitations. Fitzgibbon's prosecution of the Stay Motion was at best

an exercise in bad judgment of a young attorney whose marching orders were to get relief

from stay. If Doyle was the managing bankruptcy partner, the signatory on all the pleadings

that she claims to have reviewed, where was she? I can only conclude that Doyle abrogated

her responsibility to the Court by delegating all court appearances to Fitzgibbon and failing

to supervise and guide him as he handled these issues. If she was discussing with him the

proper prosecution of this matter, she would have learned of the Court's displeasure with

the Stay Motion proceeding and not abandoned him on the Claim Objection. If he failed

to advise her of the difficulty with the Stay Motion, she has to ask why he did not come to

her for assistance. Could it be with ten lawyers and 130 paralegals and processors, a young attorney is expected to figure it out himself.[52]

The Claim Objection. As noted, the proof of claim was filed by Moss. It was not reviewed by anyone at HSBC or Borrensen who signed it. This became especially problematic when an objection was filed to the amount claimed. Without knowing anything about the basis of the proof of claim or having access to any of the documents that would support it, Doyle, who had no part in its preparation and who did not discuss it with Borrensen or anyone for that matter, filed a form Answer stating that all figures in the proof of claim were correct. Exhibit T-4. Had Doyle even verified these numbers that she averred were correct against the Newtrak data she used to prepare the Stay Motion, she would have observed that the monthly mortgage amounts used by Moss were different than the monthly amounts in the Stay Motion. She also would have observed that the mortgage documents attached to the proof of claim related to an entirely different mortgagor.[53]

As noted by the Court in In re Wulfekuhl, 267 B.R. 856, 860 (Bankr. W.D. Mo. 2001), generic denials not supported by facts implicate the integrity of the judicial process.

---

[52] Fitzgibbon did not comment on the extent of the supervision and guidance he received from Doyle. He acknowledged that he was provided a manual but whether he could go to her freely with problems is unknown. Had he been asked, it is fairly clear that he was not in a position to point fingers at his employer. He was prepared to fall on his sword for the firm, taking full responsibility for not understanding what was required of him. This opinion should make clear that the problems that occurred were not primarily of his making but rather existed in the process used by the Udren Firm to handle referred matters. The goal was production for the client and profit for the firm based on the fee schedule for handling the matter. These objectives need not but in fact in this case did compromise the administration of justice.

[53] The latter error was picked up by the UST; the former by the Court as discussed above.

The filing of form responses to keep opposition alive without being prepared to answer to the merits causes harm to the Court and parties. Hearings are held at which the matters are not framed for resolution. The Court docket is burdened as is the Chapter 13 trustee who cannot proceed with confirmation. Id.  Rather than file a groundless pleading, counsel should pick up the phone and call opposing counsel so that when the Debtors' Claim Objection comes before the Court, an attempt would have been made to settle it or at least narrow the issues and develop a mutual game plan for judicial resolution.

Once again Doyle delegated the Court appearances to Fitzgibbon. The first hearing was adjourned for thirty days to allow Fitzgibbon to secure a loan history from HSBC. Attorneys for mortgage lenders commonly request a thirty day continuance which I have granted with the concurrence of debtor's counsel who are hopeful that a settlement can be achieved. Too often the parties return to Court admitting that the requested loan history had not been produced and seek more time. My displeasure with the lack of responsiveness of mortgagees in addressing claim objections resulted in the questions that I posed to Fitzgibbon which in turn prompted his disclosure of the NewTrak system. The mortgage lender presumably files the pleading or claim having reviewed loan histories or other documents supporting its claims; one would assume they would be available to produce when an objection is filed.[54] Assuming different counsel is involved, one would also assume

---

[54] A recent example illustrates this point. A debtor objected to a mortgage claim as seeking excessive attorneys' fees and costs. While served with the Claim Objection, the mortgage lender did not make a referral to local counsel until immediately before the hearing which had been scheduled approximately 30 days after the Objection was filed. Local counsel came in and sought the ubiquitous 30 day continuance. Debtor's counsel did not object. It was clear to me that if the
(continued...)

that new counsel would anticipate the need for documents when an objection is filed and should be able to get what is needed in the 20-30 days before the hearing.[55] I find little, if any, justification for failing to promptly provide this needed information when the procedure for securing a loan history is as simple as making an automated request and some processor spewing out the data through NewTrak or some similar automated system that is either stored there or on the MSP. Seemingly, NewTrak has the potential to make documents available to local counsel very quickly. It does not appear that this one automation benefit to all the parties has been realized since adjournments continue to be sought on consent. These delays impede confirmation of Chapter 13 plans and multiply court hearings, causing unnecessary expense to debtors and burden on the Court's docket. I made my displeasure known to Fitzgibbon when he told me at the second hearing that he had not been able to secure the loan history. In an innocent and truthful disclosure as an officer of the Court, he explained that his access to client information came from NewTrak. As noted, he also stated that he was unable to bypass that system to communicate with his client directly.

---

(...continued)

secured creditor had fees and costs in its claim, it would have had to have had the documents in support of this charge. Yet the secured creditor sought 60 days from learning of the Objection to produce the documents and was responsible for a hearing that accomplished nothing. This approach reflects an arrogance on the part of mortgagees who have little regard for the process or the costs that their conduct imposes on debtors and the court.

[55] Part of the delay is a result of the mortgage holder's refusal to retain counsel to defend the Objection until the eve of the hearing when an appearance is required. As a courtesy to a fellow member of the bar, debtor's counsel usually agree to a 30-day continuance. Mortgagees appear to rely on that outcome and have little incentive to act more promptly.

Notwithstanding the UST's conclusion that HSBC was only requested to produce a post-petition loan history and did indeed do so, I disagree with the Udren Firm's conclusion that this Court's inquiry revealed itself to be a tempest in a teapot. If the Udren Firm is delegating to a young lawyer total responsibility for handling a contested matter, it cannot hide behind his inexperience. I am puzzled that on the one hand Mr. Udren assures me that Fitzgibbon was trained by Doyle and was prepared for his assignment and on the other, states that Fitzgibbon should have known that he could have picked up the phone and called the client. Tr. 10/23/08 at 102. The use of paralegals, processors and inexperienced lawyers may be appropriate where matters are routine. Where the Court directs an inquiry of the client, the young attorney cannot be left to flounder. Had Doyle asked Fitzgibbon to report back on this protracted matter, she might have seen fit to appear to handle what had become a troublesome case at the prior Stay Motion hearing or at least prepared him to answer my questions regarding the loan history.

Finally and without regard to whether there was or was not a failure to provide the requested loan history, the barrier that NewTrak supplies to obstruct client/attorney communications is contrary to the Model Rules of Professional Conduct. Rule 1.4 mandates that a lawyer shall reasonably consult with the client about the means by which the client's objectives are to be accomplished. HSBC has directed that the "consultation" be indirect and electronic. Moreover, absent a further referral which opens up another NewTrak dialogue, the Network Firm is limited to the referred matter although other matters may arise in the bankruptcy case for that client. The Udren Firm did not believe it could deviate

from that form of consultation even when the Court expressed concern over the handling of the Stay Motion. In this case, the use of NewTrak has precluded the Udren attorneys from fulfilling this ethical responsibility.[56] Rule 3.1 prohibits a lawyer from bringing or defending a proceeding unless there is a basis in law or fact for so doing. The Explanatory Comment cautions that lawyers are required to inform themselves about the facts of their clients' cases. In <u>Martinez</u>, the Court stated:

> This rule requires a lawyer to exercise independent judgment with respect to claims a client wishes to bring and to decline to pursue claims that are frivolous.

393 B.R. at 34-35. Since there is no client consultation and since the lawyer is simply tasked to file a motion based on a pre-coded event or a claim objection based on a claim not filed by that firm, the Rules of Professional Conduct appear to have been subordinated to this automated system.

Nor is the problem solved by the theoretical availability of the escalation procedure which the Udren Office appeared to only learn about when HSBC, its attorneys and agents were summoned to Court on this matter. That the parties are able to quickly and efficiently dispose of a problem as simple as whether or not the Debtors were required to carry flood

---

[56] In <u>Parsley</u>, 384 B.R. at 148, the Court was critical of the mortgagee's practice of insulating itself from the attorney handling the file by requiring that communications be with its national counsel. As here, the client does not review the pleading before it is filed; rather it relies on the attorneys to file accurate pleadings based on information it has provided. HSBC and others who utilize NewTrak have taken the disconnect one step further since now the attorneys do not communicate with another person at all but rather two paralegals or processors are doing the communication electronically based on information generated by the system.

insurance was apparent from the settlement they made during the first hearing on the June 9

Order. I cannot help but conclude that if Udren Firm was more than a poster of messages

on NewTrak to which HSBC responded in like manner, the Claim Objection and the Relief

Motion could have been easily, fairly, and inexpensively resolved. The rigid adherence to

this automated procedure intended to facilitate the bankruptcy collection procedure failed

of its purpose in this case and presumably does in others not before me.

### III. Sanctions

The June 9 Order put the parties on notice that on the basis of my inquiry into the

practices employed in this case by HSBC, Udren, Moss and Fidelity, I would consider

whether sanctions should issue against any or all of them. Having completed that

investigation, I reject Fidelity's contention that I have obtained satisfactory answers to the

initial questions that animated the June 9 Order, i.e., availability of the post-petition loan

history and Udren's theoretical ability to communicate with its client HSBC, and that

should conclude matters. Rather while I have made findings that have reassured me as to

some of my concerns, other questionable practices were disclosed. Reliance on the

NewTrak system raises new issues that challenge the integrity of the consumer bankruptcy

process. Whether those troublesome practices lend themselves to remedies that I may or

should impose is the question I turn to last.

### Violations of Bankruptcy Rule 9011

Rule 9011(a) requires every pleading, petition, written motion and other paper

[with exceptions not relevant here] to be signed by at least one attorney. Section 9011(b)

makes clear that "[b]y presenting to the court (whether by signing, filing or later advocating)"

such paper, the signature party constitutes a certificate that the attorney or party has read

the document; that to the best of the attorney's or party's knowledge, information, and belief

formed <u>after reasonable inquiry</u> it is well grounded in fact and is warranted by existing law

or a good faith argument for the extension, modification, or reversal of existing law; and that

it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay

or needless increase in the cost of litigation or administration of the case. Fed.R.Bankr.P.

9011(b). (emphasis added).  If a document is signed in violation of this rule, the court on

motion or on its own initiative, <u>shall</u> impose on the person who signed it,[57] the represented

party, or both, an appropriate sanction, which may be monetary or directives of a non-

monetary nature but in either event not more burdensome than "what is sufficient to deter

---

[57] "Absent exceptional circumstances a law firm shall be held jointly responsible for violations committed by its partners, associates and employees." Fed.R.Bankr.P. 9011(c)(1)(A). While this quotation is found in the subsection referring to sanctions initiated by motion, the identical quote is found in the "general provisions" of Fed. R. Civ. P. 11(c)(1). However, the Advisory Committee notes to the 1997 amendments to Bankruptcy Rule 9011 make clear that the changes were intended to conform to the 1993 changes to Fed. R. Civ. 11 and references the Advisory Committee notes to that rule, which in turn makes clear that:

> when appropriate, the court can make an additional inquiry in order to determine whether the sanction should be imposed on such . . . firms . . . in addition to, or in unusual circumstances, instead of the person actually making the presentation to the court.  <u>For example, such an inquiry may be appropriate in cases involving governmental agencies or other institutional parties that frequently impose substantial restrictions on the discretion of individual attorneys employed by it.</u>

<u>Id.</u> (emphasis added). Given the obvious desire to conform Bankruptcy Rule 9011 and Federal Rule 11, the placement of the joint liability sentence in 9011(c)(1)(A) rather than directly following the general language of (c) appears inadvertent. <u>See generally</u> In re Stevens, 2007 WL 2127657, at * 7 (Bankr. D. Mont., July 19, 2007) (no substantive difference exists between Rule 9011 and Rule 11 of the Federal Rules of Civil Procedure).

repetition of the conduct or similar conduct by others similarly situated." Fed.R.Bankr.P.
9011(c)(2) (emphasis added).

There are three pleadings that were presented to the Court by the Udren Firm and/or
Moss and advocated by the Udren Firm. The Stay Motion, as noted above, was a misleading
pleading. It appears to aver that the Debtors have failed to make three post-petition
payments. This was simply not true, especially by the time Fitzgibbon pressed the issue
on May 1st. The real issue was the correct monthly payment amount since HSBC had
increased the mortgage payment to pass through an insurance premium and Debtors, who
disputed the flood insurance requirement, continued to pay the original mortgage amount.
While the Relief Motion did acknowledge a suspense balance, the pleading made no attempt
to reconcile that fact with the asserted arrearage. The Stay Motion also represented that the
Debtors had no equity in the mortgaged property, an averment Doyle admitted including
as part of a form and without any knowledge whether that was the case. While Doyle signed
the Stay Motion, Fitzgibbon advocated it in Court, relying on the Admissions when advised
that he would need a witness since the Stay Motion had been answered and was contested.
However, by then, he knew that the post-petition payments had been received and the
Admissions were incorrect.

HSBC's proof of claim was prepared by Moss processors who made two errors:
the form stated the incorrect monthly payment amount and attached the incorrect mortgage.
Based on this record, I have no basis to find anything more than negligence in the
preparation of the proof of claim. However, when Borrensen signed the proof of claim

as HSBC's authorized representative without even reviewing it, a line was crossed. Freely acknowledging that the volume of proofs of claim Moss files only allows her to review a representative sample of 10% of filed claims and that a processor audit is intended to ensure the accuracy of these document, the question is whether the Rule 9011 duty of due diligence can be delegated by the signatory. However, the problem with the Claim Objection as raised by the June 9 Order is that HSBC employs, presumably to save money, a local law firm to respond to any objections by the debtor to the proof of claim. Doyle filed a "form" answer to the Claim Objection representing the accuracy of the proof of claim admittedly without any verification of the facts or taking any note of the incorrect mortgage document attached thereto. While these errors in the proof of claim were not raised by Hamer, they rendered Doyle's answer untrue and provided further support to my denial of the Stay Motion.[58]

Based on the foregoing, I find that Doyle failed to observe her duty to make reasonable inquiry of the two documents she signed. The UST concurs in this assessment.[59] The Stay Motion's averment about lack of equity and the Answer to the Claim Objection

---

[58] Udren argues that this error should be overlooked since a statement of the current monthly mortgage amount is not necessary for preserving the prepetition claim. If not necessary, then why was it included? Presumably there was some point to this averment.

[59] The Udren Firm responds to this charge made by the UST, stating that the proposition that attorneys may not rely on paralegal downloading information is "astonishing." It describes this as " the necessary compartmentalizing of roles in a volume practice." Udren Brief at 2. The Udren Firm misses the point. Doyle did not function as a lawyer but rather acted as a blind signatory who at best checked numbers. She signed off on her paralegal's preparation of a form motion and admissions and was prepared to press for relief from stay when, by Udren's own admission, the problem was a dispute over a $180 monthly shortfall in the payment amount due to the insurance premium dispute.

in its entirety were rote averments from form pleadings signed without any inquiry, a clear

violation of Rule 9011 as Doyle's signature constitutes a certification that she believes

after a reasonable inquiry that the document is well-grounded in fact and warranted by

existing law. Fed.R.Bankr.P. 9011(a). I fear that in the move toward efficiency using fill

in the blank form documents prepared by paralegals for an attorney's signature, the signers

have lost sight of their Rule 9011 obligations, so much so that, like Doyle, they do not

appear to even recognize their questionable conduct. In re Nosek, 386 B.R. 374 (Bankr. D.

Mass. 2008). I also conclude that Fitzgibbon in advocating the Stay Motion on admissions

he knew to be then untrue committed a Rule 9011 violation. Finally if the random proof of

claim review conducted by Borrensen did not include the proof of claim filed for HSBC in

the Taylor matter as he appears to acknowledge, it would appear that Borrensen in signing

and presenting a document without any knowledge of its factual basis would have failed to

discharge her duty as well.

Where a court finds a violation of Rule 9011, it must impose sanctions on the violator

that are "limited to what is sufficient to deter a repetition of such conduct or comparable

conduct by others similarly situated." Fed.R.Bankr.P. 9011(c)(2). Those sanctions may be

monetary but where a court acts on its own motion, as I have, the award may only be paid

to the Court. Id.; Aston-Nevada Limited Partnership, 391 B.R. 84, 107 (Bankr. D. Nev.

2006). I find non-monetary sanctions appropriate in this case, some of which have already

been experienced. The Udren Firm has incurred the cost of retaining counsel who has

appeared and filed written memoranda on its behalf; its attorneys and paraprofessionals have

lost valuable time in connection with the hearings and depositions conducted in furtherance of these proceedings. The foregoing is sufficient monetary penalty to the Udren Firm which is jointly reponsible with Doyle and Fitzgibbon for these breaches. I am disappointed that the Udren Firm, in particular Doyle, did not appear to understand the deficiency of the conduct.[60] I believe Doyle may be so enmeshed in the assembly line of managing the bankruptcy department's volume mortgage lender practice that she has lost sight of her duty to the court and has compromised her ethical obligations. I believe she will benefit from a refresher and will order 3 credits of CLE in professional responsibility/ethics above what she is required to obtain as part of the continuing legal education requirement. I will impose no separate sanction on Fitzgibbon. I believe these proceedings have been very hard on this young lawyer and while lack of experience is not a defense to a Rule 9011 violation, I suspect that he has learned all that he needs to learn without protracting this unfortunate time in his nascent career.

As head of the Udren Firm, Mr. Udren sets the tone and establishes its culture. He notes his firm's reliance on NewTrak and other such aids as essential to the economic structure of the law practice. However, he had little familiarity with the actual operation

---

[60] The Udren Firm, as noted, took an aggressive stance in these proceedings, failing to recognize any deficiencies in the firm's practices. The Udren Brief points to errors and confusion caused by Hamer and a stern and confusing judge who caused an inexperienced young associate to "panic." Udren Brief at 3. In other words the problem was everyone but the responsible Udren Firm attorneys. I agree that Hamer's legal skill in bankruptcy was deficient but that fact does not absolve the Udren Firm. Many debtor attorneys struggle in these cases and many debtors have no attorneys at all. I am hopeful that the Udren Firm's posture reflects the advocacy of its counsel and not the mind set of the Udren Firm which hopefully has learned from these mistakes and will not repeat them.

of NewTrak and did not appear to get involved in the "weeds" of the bankruptcy practice.

He assured the Court that his attorneys and managers could pick up the telephone and call

HSBC when the evidence and his own escalation procedure suggests otherwise. The culture

of the firm he has fostered appears to value production over professionalism, a priority

acceptable for a business but potentially antagonistic to the practice of law. Parsley, 384

B.R. at 183 (condemning a culture that condones acceptance of barriers to direct client

communication, preparation of motions for relief from stay which are not reviewed by the

client for accuracy, signing proofs of claim without contacting the client to review and

confirm the debt figures). The incidents I have described above, which are not as egregious

as some of the practices sanctioned in other recently reported decisions, are not isolated to

this case or to this residential mortgage lender law firm. Mr. Udren may not be aware of the

questionable practices imposed by his firm's acquiescence to NewTrak and how little legal

judgment is employed as a result or he may be aware and find it acceptable. To examine

these practices in light of extant ethical obligations, I will direct him to obtain training

in NewTrak and spend a day observing his bankruptcy attorneys, paralegals, managers

and processors as they handle referrals. Since policy emanates from the top, I will also order

Udren and Doyle to conduct a training session for all members of the bankruptcy department

in the appropriate use of the escalation procedure and the requirements of Rule 9011 with

respect to pre-filing due diligence.

Moss, unlike the Udren Firm, does not appear in this district. The implications of its

procedure for preparing and filing proofs of claim nationally for HSBC go beyond the

scope of the investigation that I initiated. I am concerned that Borrensen signs a plethora of proofs of claim while reviewing only 10% of them. There were two errors in the Taylor claim form, one a result of an incorrect electronic attachment of the mortgage and the other one a careless error in stating the former current mortgage payment. Neither affected the substance of the claim, and neither was raised by Debtors' counsel. If Borrensen had reviewed the claim, she would likely have caught the first error but not the second which was a filing error. The issue is not the errors in this proof of claim but the absence of review by the authorized signatory in 90% of the claims filed.

In filing the Second Vacate Motion, the UST advised that the Office of the UST is investigating Moss' claims filing process in other cases. As noted above, the UST has not completed her review of Moss' conduct in this and those other cases in which Moss is the exclusive claims filing agent. Presumably what she has learned in this case will facilitate that inquiry. I believe it would be premature on this record to impose sanctions that would require or fail to require any change to the Moss procedure. Given the implications for that firm, I believe they should have an opportunity to respond to any charges that their procedures violate Rule 9011. Unlike the Udren Firm which has filed a detailed memorandum responding to all the alleged deficiencies in its handling of the Taylor matter, Moss, although sharing counsel with HSBC, has not expressed its views. I therefore leave the matter of Moss to the UST's contemplated further investigation. The Order Re: Protected Documents entered contemporaneously recognizes the foregoing.

HSBC, as the client may be subject to Rule 9011 sanctions although it did not sign the documents presented to the Court. In re Kilgore, 253 B.R. 179, 185-86 (Bankr. D. S.C. 2000). The problems in this case arose primarily because of the Udren Firm's slavish adherence to NewTrak. Graves testified that deviation from NewTrak inquiry is not prohibited. If the escalation procedure she described is a true option for local counsel, the Udren Firm either did not know or did not believe that it could be used when a stay relief motion or claim objection is subject to non-routine opposition. Other firms used by HSBC are likely under the same impression. Accordingly, I will direct HSBC to prepare and transmit by mail and e-mail a letter to all the Network Firms outlining the escalation policy and encourage its use consistent with the Rules of Professional Conduct. HSBC should also advise the Network Firms that use of direct contact will not reflect adversely on the firm. The letter will be accompanied by a copy of this Opinion.

Based on this record, I find that sanctions against LPS are not warranted.[61] While it does appear from the limited screens that have been introduced in this case, that LPS' involvement ges beyond passing data through their automated system, I cannot conclude that it imposed restrictions on the Udren Firm's handling of this case. But see Martinez, 393 B.R. at 31 (client would not allow lawyer to vacate erroneous stipulation). The Udren Firm entered into a contract with Fidelity which it viewed as advantageous to the business

---

[61] Thus, I need not resolve the contradictory terms of the DSA and Network Agreement as to LPS's agency which might subject them to Rule 9011 liability if it were directing the motions and pleadings that were filed.

relationships with its mortgage lender client base and presumably its own bottom line. As attorneys, the Udren Firm understood an attorney's obligations under Rule 9011 to investigate and took a lesser approach. While NewTrak prescribed that approach, LPS did not dictate how they would handle cases referred to them when problems with the procedure were apparent. By misusing the resources made available to them, the Udren Firm, not LPS, was responsible for the Rule 9011 deficiencies in this bankruptcy case.

<u>Sanctions Under the Court's Inherent Powers</u>

Rule 9011 is implicated only where a document has been presented to the court. "Without such a predicate act, there is no violation of Rule 9011." <u>In re Aston-Nevada Limited Partnership</u>, 391 B.R. 84,103 (Bankr. D. Nev. 2006). Thus, many of the questionable practices resulting from the use of the NewTrak system are not susceptible to remedy under Rule 9011.

The unavailability of Rule 9011 does not leave the court without authority as it may utilize its inherent power to regulate practice before it by imposing sanctions in appropriate cases. However, the use of this power is intended to be more constrained. Whereas the standard for a Rule 9011 violation is "objective unreasonableness conduct," sanctions imposed under the inherent powers require a finding of willful actions, including recklessness and bad faith.[62] <u>Aston-Nevada Ltd. Partnership</u>, 391 B.R. at 104. While I believe that the process by which mortgagees prosecute their bankruptcy claims using

---

[62] The burden of proof to establish the appropriateness of Rule 9011 sanctions, <u>i.e.</u>, a preponderance of the evidence, is also less stringent than the burden under the court's inherent powers, <u>i.e.</u>, totality of the evidence. <u>Parsley</u>, 384 B.R. at 179-80.

NewTrak and other electronic mediaries has sacrificed accuracy and fairness to efficiency and cost-savings, I find no evidence that the conduct of HSBC or any of its attorneys or agents rises to the level of recklessness or bad faith.

## CONCLUSION

My research has disclosed no other published opinion that explains the NewTrak process that is utilized by so many consumer mortgage lenders seeking relief in bankruptcy cases. I have attempted to share my education in this Opinion. Finally, it is my hope that by bringing the NewTrak process to the light of day in a published opinion, systemic changes will be made by the attorneys and lenders who employ the system or at least help courts formulate the right questions when they have not. While NewTrak has many features that make a volume business process more efficient, the users may not abandon their responsibility for fairness and accuracy to the seduction of electronic communication. The escalation procedures in place at HSBC and the Udren Firm existed on paper only. When an attorney appears in a matter, it is assumed he or she brings not only substantive knowledge of the law but judgment. The competition for business cannot be an impediment to the use of these capabilities. The attorney, as opposed to a processor, knows when a contest does not fit the cookie cutter forms employed by paralegals. At that juncture, the use of technology and automated queries must yield to hand-carried justice. The client must be advised, questioned and consulted. Young lawyers must be trained to make those judgments

as opposed to merely following the form manual.  Until they are capable of doing so, they should be supported and not left to sink or swim alone in an effort for the firm to be more profitable by leveraging the cheapest labor.

At issue in these cases are the homes of poor and unfortunate debtors, more and more of whom are threatened with foreclosure due to the historic job loss and housing crisis in this country.  Congress, in its wisdom, has fashioned a bankruptcy law which balances the rights and duties of debtors and creditors.  Chapter 13 is a rehabilitative process with a goal of saving the family home.  The thoughtless mechanical employment of computer-driven models and communications to inexpensively traverse the path to foreclosure offends the integrity of our American bankruptcy system.  It is for those involved in the process to step back and assess how they can fulfill their professional obligations and responsibly reap the benefits of technology.  Nothing less should be tolerated.

An Order consistent with the foregoing Opinion shall be entered.

_____
DIANE WEISS SIGMUND
United States Bankruptcy Judge

Dated: April 15, 2009